# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| DATATERN, INC.,<br>a Texas corporation, | ) |
| | ) |
| AMPHION INNOVATIONS US INC.,<br>a Delaware corporation, and | ) |
| | ) |
| FIRESTAR SOFTWARE, INC.,<br>a Delaware corporation, | ) |
| | ) |
|       Plaintiffs and<br>      Counterclaim Defendants, | ) |
| v. | )    Case No. 2:09-CV-38 |
| | )   **JURY TRIAL DEMANDED** |
| FOLEY & LARDNER LLP,<br>a Wisconsin limited liability partnership, | ) |
| | ) |
|       Defendant, Counterclaim<br>      Plaintiff, Third-Party Plaintiff,<br>      and Cross-Claim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ERICH L. SPANGENBERG, | ) |
| | ) |
|    Serve:   9806 Inwood Road<br>           Dallas, Texas  75220-2131, | ) |
| | ) |
| IP NAVIGATION GROUP, LLC,<br>a Texas limited liability company, | ) |
| | ) |
|    Serve:   Erich L. Spangenberg<br>           IP Navigation Group, LLC<br>           Two Lincoln Centre<br>           5420 LBJ Freeway, Suite 750<br>           Dallas, Texas  75240<br>           Telephone:  (214) 438-0810, | ) |
| | ) |

AUDREY L. SPANGENBERG,                          )
                                                )
    <u>Serve</u>:    9806 Inwood Road                )
               Dallas, Texas 75220-2131,       )
                                                )
TECHDEV HOLDINGS LLC                            )
f/k/a PLUTUS IP LLC1,                           )
a Texas limited liability company, and          )
                                                )
    <u>Serve</u>:    Audrey L. Spangenberg           )
               270C North Washington Avenue    )
               Marshall, Texas 75670-3326,     )
                                                )
ACCLAIM FINANCIAL GROUP, LLC,                   )
a Texas limited liability company,              )
                                                )
    <u>Serve</u>:    Audrey L. Spangenberg or        )
               David Pridham (Registered Agent) )
               270C North Washington Avenue    )
               Marshall, Texas 75670-3326      )
                                                )
               Third-Party Defendants and      )
               Cross-Claim Defendants.         )
                                                )

## FOLEY & LARDNER LLP'S
## FIRST AMENDED COUNTERCLAIMS,
## <u>THIRD-PARTY COMPLAINT, AND CROSS-CLAIMS</u>

Defendant Foley & Lardner LLP ("Foley & Lardner"), by counsel, respectfully

states as follows for its Amended Counterclaims against Plaintiffs Datatern, Inc.

("Datatern"), Amphion Innovations U.S. Inc. ("Amphion"), and FireStar Software,

Inc. ("FireStar") (collectively, the "Datatern Parties") and for its third-party

complaint and cross-claims against Erich L. Spangenberg ("Mr. Spangenberg"), IP

Navigation Group, LLC ("IP Navigation"), Audrey L. Spangenberg

("Mrs. Spangenberg"), TechDev Holdings LLC, f/k/a Plutus IP LLC1 ("Plutus"), and

Acclaim Financial Group, LLC ("Acclaim") (collectively, the "Plutus Parties").

2

## OVERVIEW OF THE PARTIES' DISPUTE

1.     This action results from the Plutus Parties' tortious interference with Foley & Lardner's attorney-client relationship and contract with the Datatern Parties.  As a result of the Plutus Parties' wrongful conduct as hereinafter alleged, Foley & Lardner's work product has been misappropriated without payment therefor, thereby unjustly enriching the Plutus Parties and — to a lesser extent — the Datatern Parties.

2.     Originally named for the Greek god of wealth, Third-Party Defendant and Cross-Claim Defendant Plutus is one of many "non-practicing entities" owned and controlled by Mr. and Mrs. Spangenberg.    The Plutus Parties "do not manufacture products, but instead hold licenses to numerous patents, which they license and enforce against alleged infringers." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 519 F. Supp. 2d 905, 911 (W.D. Wis. 2007).  With respect to an affiliate of the Plutus Parties by the name of Orion, the U.S. District Court for the Western District of Wisconsin observed:

> Orion and other Orion Related Companies are in the business of enforcing their patents through lawsuits and licensing them; their primary operating expenses are legal fees and their primary source of income is from litigation settlements.  The business model of Orion is to license patents through litigation:   first file a lawsuit, then negotiate a licensing agreement as part of settlement.  Orion has been a party to approximately 100 litigation settlement agreements.  As of October 2007, Orion had generated approximately $72.3 million in revenues, primarily from litigation settlements.  At that time Orion had incurred expenses of approximately $20.7 million, most of which was for legal fees, expert fees, court reporters, and other litigation-related expenses.

WASH_6395668.1

*Taurus IP, LLC v. DaimlerChrysler Corp.*, 559 F. Supp. 2d 947, 958 (W.D. Wis. 2008).

3.     The attorney-client relationship and contract with which the Plutus Parties tortiously interfered include the agreement whereby Plaintiffs FireStar and Amphion retained Foley & Lardner to represent them in an action claiming patent infringement by Red Hat and styled *FireStar Software, Inc. v. Red Hat, Inc.,* Civil Action No. 2:06-cv-258, in the United States District Court for the Eastern District of Texas, Marshall Division (the "Lawsuit").

4.     FireStar was a pre-existing client of Foley & Lardner before retaining the firm to represent it in the Lawsuit. Amphion became a client of Foley & Lardner by virtue of its business relationship with FireStar, to which Amphion's promotional materials refer as a "partner company."

5.     Datatern purportedly became a client of Foley & Lardner in late 2007 at the request of Amphion, which represented to Foley & Lardner that Datatern was a newly-formed Amphion subsidiary.   On February 8, 2008, ownership of the patents at issue in the Lawsuit was assigned to Datatern.  Unbeknownst to Foley & Lardner at the time, Datatern did not even exist.  Rather, it was not formed as a Texas corporation until April 15, 2008 pursuant to the wrongful conduct of the Plutus Parties of which Foley & Lardner complains.

6.     Two years earlier, before commencing the Lawsuit against Red Hat, Plaintiffs FireStar and Amphion had made a settlement demand on Red Hat in excess of $100 million.  Although Red Hat was not willing to pay that much to settle

4

the patent infringement claims in advance of litigation, Red Hat's recognition of the magnitude of its exposure is reflected by the fact that — in connection with an agreement to acquire another company — Red Hat established an escrow for Plaintiffs' infringement claims in the amount of $43 million.

7.      In view of the magnitude of their damage claims, FireStar and Amphion agreed to a litigation budget of $4.4 million pursuant to the fee for service agreement alleged in Plaintiffs' initial Complaint.   Curiously, Plaintiffs recently amended their Complaint not only to assert different legal theories but also to attempt to change — after the fact — their fee for service agreement with Foley & Lardner into a contingent fee agreement.   Regardless of what allegedly happened between the filing of Plaintiffs' original Complaint and the filing of their First Amended Complaint to change the nature of their contract with Foley & Lardner, the documentary evidence cannot be squared with this belated allegation.   Rather, it is clear that, at one point relatively late in the litigation, Foley & Lardner did discuss the possibility of handling *future* work on a contingent fee basis.   Such a proposal was never approved or agreed to, however, before attorneys for the Plutus Parties took over conduct of the Lawsuit and settled it on terms that were favorable only to Mr. and Mrs. Spangenberg and the other Plutus Parties.

8.      From the outset of the Lawsuit, Plaintiffs FireStar and Amphion assured Foley & Lardner that they would obtain financing for pursuit of their patent infringement claims and that being or working with a non-practicing entity was inconsistent with their business model.   Time and time again, sources of

5

financing that Plaintiffs represented they were likely to obtain did not, for various reasons, materialize. As a result, Plaintiffs were in arrears to Foley & Lardner for an amount in excess of $2 million, which Plaintiffs subsequently paid down to the current balance of $1,571,038.63 (not including interest).

9.    Unable to obtaining financing for the Lawsuit elsewhere, Plaintiffs turned to the Plutus Parties. Approximately one month before the all important *Markman* hearing — at a time when Foley & Lardner's bills were below the litigation budget to which Plaintiffs had agreed — Foley & Lardner was discharged as counsel for Plaintiffs in the Lawsuit. To replace Foley & Lardner as counsel of record in the Lawsuit, Plaintiffs retained attorneys with whom Mr. Spangenberg regularly works.

10.    While failing to pay Foley & Lardner, Plaintiffs and the Plutus Parties used and misappropriated Foley & Lardner's work product to pursue Plaintiffs' claims in the Lawsuit. Rather than look out for Plaintiffs' interests, however, the Plutus Parties were interested only in making a "quick buck."

11.    Approximately one month after assuming control of the Lawsuit, the Plutus Parties settled Plaintiffs' claims for approximately ten cents on every dollar that had been reserved by Red Hat for payment of Plaintiffs' patent infringement claims. Of the $4.2 million settlement that the Plutus Parties obtained on behalf of Plaintiffs, the Plutus Parties took $3.4 million. This 80 percent contingent fee pocketed by the Plutus Parties was allegedly for "consulting services" performed during a brief period by one of the Plutus Parties, IP Navigation. Plaintiffs were

6

not willing to accept only $4.2 million settlement from Red Hat before coming under the control of the Plutus Parties.  To the contrary, the amount of the settlement brokered by or at the behest of the Plutus Parties was less than the amount of the litigation budget to which FireStar and Amphion had previously agreed in the hope of obtaining a much greater recovery.

12.    Since settling with Red Hat, Datatern has — using Foley & Lardner's work product — asserted and threatened to assert patent infringement claims similar to those that were the subject of the Lawsuit.  At least some of those claims have resulted in settlement agreements whereby one or more of the Datatern Parties and the Plutus Parties have received millions of dollars in royalty and other payments, thereby unjustly enriching them further.

13.    At this juncture, the only party that has nothing to show for Foley & Lardner's legal services is Foley & Lardner.  Plaintiffs have breached their agreement to pay $1,571,038.63 (plus interest), and the Plutus Parties have been unjustly enriched in an amount exceeding $3.4 million.

## **PARTIES**

### **(Foley & Lardner LLP)**

14.    Foley & Lardner is a limited liability partnership organized under the laws of the state of Wisconsin.

15.    Founded in 1842 in Milwaukee, Wisconsin, Foley & Lardner now has approximately 1,000 attorneys in 21 offices, including 18 in the U.S.  The U.S. offices of Foley & Lardner LLP are located in Boston, Massachusetts; New York,

WASH_6395668.1

New York; Washington, D.C.; Miami, Orlando, Jacksonville, Tampa, and Tallahassee, Florida; San Francisco, Silicon Valley (Palo Alto), Sacramento, Los Angeles, San Diego, and Del Mar, California; Chicago, Illinois; Detroit, Michigan; and Madison and Milwaukee, Wisconsin. The overseas offices of Foley & Lardner LLP are located in Brussels, Belgium; Shanghai, China; and Tokyo, Japan.

16.    Foley & Lardner is widely recognized among corporate clients as a leader in client service. For example, in a three-year study of the nation's top 400 law firms, Foley & Lardner was ranked among the top four in the country for its commitment to excellence and outstanding client service. The BTI "Power Elite" study, conducted by The BTI Consulting Group of Wellesley, Massachusetts, was based on more than 1,700 interviews with corporate counsel at large publicly and privately held organizations with more than $1 billion in revenue. This past year was the fourth year in a row that Foley & Lardner has been named by BTI as being among the "Power Elite." Earlier last year, another BTI study named Foley & Lardner as a "rising star" and to its "Client Service A-Team Top 30."

17.    Foley & Lardner is also widely recognized among corporate clients as a leader in intellectual property law. In recent rankings published by *Corporate Counsel* magazine entitled "Who Represents America's Biggest Companies," Foley & Lardner tied with three other law firms for the most mentions by Fortune 100 companies in the areas of intellectual property and intellectual property litigation. Foley & Lardner's intellectual property practice received the top ranking in this prestigious list in prior years. In addition to this recent recognition, Foley &

WASH_6395668.1

Lardner's intellectual property practice was ranked by *IP Today* as one of the top 10 firms for the number of patents issued for 8 years in a row and as one of the top patent litigation firms in the nation by *IP Law & Business* magazine from 2002 through 2008.

### (THE DATATERN PARTIES)

### (Datatern)

18.    Datatern is a Texas corporation with its principal place of business in New York City, where Amphion is also headquartered.

### (Amphion)

19.    Amphion is a Delaware corporation with its principal place of business in New York City.

### (FireStar)

20.    FireStar is a Delaware corporation with its principal place of business in Framingham, Massachusetts.

### (THE PLUTUS PARTIES)

### (Mr. Spangenberg)

21.    Mr. Spangenberg is an individual who resides in Dallas, Texas.

22.    Mr. Spangenberg is an officer, principal, or member of IP Navigation, Plutus, and Acclaim.

23.    At all times material to Foley & Lardner's First Amended Counterclaims, Third-Party Complaint, and Cross-Claims, Mr. Spangenberg — together with Mrs. Spangenberg — directed and controlled the conduct of the

9

various Plutus Parties of which Foley & Lardner complains, thereby tortiously interfering with Foley & Lardner's attorney-client relationship and contract with the Datatern Parties and misappropriating Foley & Lardner's work product.

24.     For the purpose of the tortious interference and other wrongful conduct of which Foley & Lardner complains, the Plutus Parties retained the services of at least two attorneys who entered appearances in the Lawsuit on behalf of the Datatern Parties.   These attorneys, who have regularly represented the Plutus Parties in other matters, include Daniel F. Perez of the Perez Law Firm in Dallas ("Mr. Perez") and Patrick R. Anderson of Patrick R. Anderson PLLC in Flint, Michigan ("Mr. Anderson").

25.     Mr. Anderson is in fact regularly, retained, or otherwise compensated by the Plutus Parties.  *Taurus IP, LLC v. DaimlerChrysler Corp.*, 559 F. Supp. 2d 947, 971 (W.D. Wis. 2008).

26.     Since its formation April 15, 2008, — ostensibly as an affiliate of Amphion — Datatern has filed a number of patent infringement cases in this Court. These cases include the following:

10

| Date Filed | Case Name, Case No., Court | Counsel of Record for Datatern |
|---|---|---|
| April 21, 2008 | *Datatern, Inc. v. Bank of America Corp., et al.*, Case No. 5:08-cv-70, Eastern District of Texas (Texarkana) | Patrick R. Anderson<br>Patrick R. Anderson, PLLC<br>4225 Miller Road<br>Bldg B-9, Suite 358<br>Flint, Michigan 48507<br><br>Daniel F. Perez<br>The Perez Law Firm<br>6131 Park Lane<br>Dallas, Texas 75225<br><br>Andrew W. Spangler<br>Spangler Law PC<br>208 North Green Street, Suite 300<br>Longview, Texas 75601<br><br>Marc A. Fenster, Andrew D. Weiss, and Robert E. Satterthwaite<br>Russ August & Kabat<br>12424 Wilshire Blvd., 12th Floor<br>Los Angeles, California 90025 |
| Aug. 5, 2008 | *Datatern, Inc. v. Sun Microsystems Inc., et al.*, Case No. 2:08-cv-307, Eastern District of Texas (Marshall) | Patrick R. Anderson<br>Patrick R. Anderson, PLLC<br>4225 Miller Road<br>Bldg B-9, Suite 358<br>Flint, Michigan 48507<br><br>Daniel F. Perez<br>The Perez Law Firm<br>6131 Park Lane<br>Dallas, Texas 75225<br><br>Andrew W. Spangler<br>Spangler Law PC<br>208 North Green Street, Suite 300<br>Longview, Texas 75601<br><br>Marc A. Fenster, Andrew D. Weiss, and Robert E. Satterthwaite<br>Russ August & Kabat<br>12424 Wilshire Blvd., 12th Floor<br>Los Angeles, California 90025 |

WASH_6395668.1

| Date Filed | Case Name, Case No., Court | Counsel of Record for Datatern |
|---|---|---|
| Aug. 5, 2008 | *Datatern, Inc. v. Oracle Corp., et al.,* Case No. 2:08-cv-308, Eastern District of Texas (Marshall) | Patrick R. Anderson<br>Patrick R. Anderson, PLLC<br>4225 Miller Road<br>Bldg B-9, Suite 358<br>Flint, Michigan 48507<br><br>Daniel F. Perez<br>The Perez Law Firm<br>6131 Park Lane<br>Dallas, Texas 75225<br><br>Andrew W. Spangler<br>Spangler Law PC<br>208 North Green Street, Suite 300<br>Longview, Texas 75601<br><br>Marc A. Fenster, Andrew D. Weiss, and Robert E. Satterthwaite<br>Russ August & Kabat<br>12424 Wilshire Blvd, 12th Floor<br>Los Angeles, California 90025 |
| Feb. 17, 2009 | *Datatern, Inc. v. United Air Lines, Inc., et al.,* Case No. 2:09-cv-53, Eastern District of Texas (Marshall) | Patrick R. Anderson<br>Patrick R. Anderson, PLLC<br>4225 Miller Road<br>Bldg B-9, Suite 358<br>Flint, Michigan 48507<br><br>Andrew W. Spangler<br>Spangler Law PC<br>208 North Green Street<br>Suite 300<br>Longview, Texas 75601<br><br>Marc A. Fenster<br>Andrew D. Weiss<br>Russ August & Kabat<br>12424 Wilshire Boulevard<br>12th Floor<br>Los Angeles, California 90025 |

12

| Date Filed | Case Name, Case No., Court | Counsel of Record for Datatern |
|---|---|---|
| June 2, 2009 | *Datatern, Inc. v. The Allstate Corp., et al.*, Case No. 2:09-cv-178, Eastern District of Texas (Marshall) | Patrick R. Anderson<br>Patrick R. Anderson, PLLC<br>4225 Miller Road<br>Bldg B-9, Suite 358<br>Flint, Michigan 48507<br><br>Andrew W. Spangler<br>Spangler Law PC<br>208 North Green Street<br>Suite 300<br>Longview, Texas 75601<br><br>Marc A. Fenster<br>Andrew D. Weiss<br>Russ August & Kabat<br>12424 Wilshire Boulevard<br>12th Floor<br>Los Angeles, California 90025 |

### (IP Navigation)

27.    IP Navigation is a limited liability company with its principal place of business in Dallas, Texas.

28.    IP Navigation "is one of the entities owned and operated by [Mr.] Spangenberg, and it provides consulting services to [Mr.] Spangenberg's other patent-holding entities." *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, No. 6:07-CV-346, 2008 U.S. Dist. LEXIS 107096, *11 (E.D. Tex. Mar. 14, 2008).

### (Mrs. Spangenberg)

29.    Mrs. Spangenberg is an individual who resides in Dallas, Texas.

30.    Together with Mr. Spangenberg, Mrs. Spangenberg owns, controls, and directs the activities of IP Navigation, Plutus, and Acclaim, including the conduct of which Foley & Lardner complains.

WASH_6395668.1

**(Plutus)**

31.    Plutus is a limited liability company with its principal place of business in Marshall, Texas that is owned, controlled, and directed by Mr. and Mrs. Spangenberg.

32.    Plutus is one of the instrumentalities through which Mr. and Mrs. Spangenberg have perpetrated frauds upon Foley & Lardner and others — including various patent owners and alleged infringers and various federal courts. *See, e.g., Taurus IP, LLC v. DaimlerChrysler Corp.*, 519 F. Supp. 2d 905, 920 (W.D. Wis. 2007) ("protecting the corporate fiction separating third party defendant Spangenberg and the nonpracticing entities would 'accomplish some fraudulent purpose' or 'defeat a strong equitable claim.'"); *Taurus IP, LLC v. DaimlerChrysler Corp.*, 534 F. Supp. 2d 849, 872-73 (W.D. Wis. 2008) ("a jury could find that [Mr.] Spangenberg used Orion IP and the related companies to conceal a related patent, settle a related lawsuit (by leading defendants to believe they were getting more protection than they were) and return to sue the same defendants later. . . . ***Therefore, a reasonable jury could find [Mr.] Spangenberg's actions to be 'so grossly unfair as to amount to constructive fraud.'***") (emphasis added). In subsequent rulings, the U.S. District Court for the Eastern District of Wisconsin concluded that this pattern of fraudulent conduct extended to the conduct of the litigation generally. *See, e.g., Taurus IP, LLC v. DaimlerChrysler Corp.*, 559 F. Supp. 2d at 966-68.

14

**(Acclaim)**

33.     Acclaim is a limited liability company with its principal place of business in Marshall, Texas.

34.     "The companies managed by [Mr.] Spangenberg are organized in a hierarchical structure and ultimately owned by a company called Acclaim Financial Group, LLC, which in turn is 99% owned by [Mr.] Spangenberg's wife, Audrey Spangenberg, and 1% owned by [Mr.] Spangenberg's minor child, Christian Spangenberg." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 559 F. Supp. 2d at 953.

35.     In *ST Sales*, this Court took the unusual step of granting a protective order to preclude Acclaim's registered agent, David Pridham ("Mr. Pridham"), from viewing defendants' "attorney's eyes only" discovery documents.  Mr. Pridham has represented a number of the Plutus Parties in patent infringement litigation, in this Court and elsewhere, while also serving as general counsel of IP Navigation.  In support of its ruling in *ST Sales*, this Court observed:

> Defendants have presented a bevy of information indicating that Pridham has served in many capacities throughout Spangenberg's many patent-holding entities since the two first met. In previous litigation, Spangenberg testified that (at that time) Pridham served as "both the general counsel at [IP Navigation Group, LLC] and then in a separate capacity he's outside counsel as well." *See* Trial Transcript at 193:15-22 (May 23, 2007), *Orion IP, LLC v. Hyundai Motor Co.,* 6:05-cv-322 (E.D. Tex. 2007). IP Navigation Group, LLC (hereinafter "IP Nav") is one of the entities owned and operated by Spangenberg, and it provides consulting services to Spangenberg's other patent-holding entities. *Id.* at 184:15-24. Defendants also note that Pridham has appeared in pleadings as affiliated with Orion IP or other Spangenberg entities at least seven times between 2004 and 2006, but since 2006 Pridham has generally identified himself as affiliated with IP Nav. Def.'s Mot. For Entry Protective Order at 5.  Perhaps emblematic of the confused mixing of roles within the various entities, during one patent infringement lawsuit, Pridham listed himself as Orion's in-

WASH_6395668.1

house counsel, but with an @ipnav email address. *See* Complaint at 4, *Orion IP, LLC v. Staples, Inc.,* No. 2:04-cv-297 (E.D. Tex. 2004). Aside from his role as in-house counsel and outside counsel to Spangenberg entities, Pridham has also served in at least one Spangenberg entity solely in a business capacity. Defendants cite reporting forms indicating Pridham served as a director on the board of In Store Media Systems, a company of which Spangenberg was director, CEO, treasurer, and secretary. Def.'s Mot. For Entry Protective Order at 4; (Doc. No. 88, Exs. 8-9). In his legal roles, Pridham provides many services to Spangenberg's entities. IP Nav, the entity Pridham most often associates himself with as either general counsel or outside counsel, "manages, acquires and monetizes a diverse group of patents," and involves its attorneys with "a variety of prosecution, licensing and litigation projects." Def.'s Mot. For Entry of Protective Order at 4 (citing IP Nav attorney job posting attached as exhibit); (Doc. No. 88, Ex. 2). Whether within IP Nav or serving as outside counsel, Pridham himself focuses his practice on patent litigation, licensing, and acquisition for Spangenberg's entities. Defendants attached a chart to their motion indicating that Pridham has appeared as counsel (affiliated with IP Nav) in at least 38 different lawsuits on behalf of at least six different Spangenberg entities: Sales Tech, Orion IP, Phoenix, Polaris, Triton, and Constellation. *See* Def.'s Mot. For Entry Protective Order at 4 n.7 (Doc. No. 88, Ex. 4). Sales Tech does not dispute Pridham's extensive role in its litigation ventures, and also admits to Pridham's role in the licensing of patents in settlement of litigation. Pl.'s Resp. To Def.'s Mot. For Entry of Protective Order at 2. Sales Tech specifically denies that Pridham provided any legal services related to the acquisition of the *'305 patent*, but it makes no denial or mention of Defendants' repeated accusations of his involvement in Spangenberg's acquisition of other patents. Also, despite Spangenberg's previous statements, Sales Tech now claims that Pridham is strictly outside general counsel for patent litigation and the related licensing of patents in settlement, and that he is not an employee or owner of IP Nav or involved in management of any kind. Though Sales Tech claims Pridham is not an employee, Pridham continues to use IP Nav's business mailing address and email address. Pridham claims the address is nothing more than a "a convenient mail stop" in Texas while he works in Rhode Island. Pl.'s Resp. To Def.'s Mot. For Entry of Protective Order at 2.

*Id.* at *10-814 (footnotes omitted).

16

**(Alter Egos)**

36.    IP Navigation, Plutus, and Acclaim are owned and controlled by Mr. and Mrs. Spangenberg, and are alter egos of one another.  To the extent that various entities owned and controlled by Mr. and Mrs. Spangenberg — including Acclaim, Plutus, and IP Navigation — are incorporated or otherwise formed for the purpose of limiting their liability, their corporate form or separate formation should be disregarded because they have been undercapitalized, disregarded corporate and other formalities, and acted as a single entity for the purpose of perpetrating frauds upon Foley & Lardner, other litigants, this Court, and other courts.

37.    In *Taurus IP, LLC v. DaimlerChrysler Corp.*, the U.S. District Court for the Western District of Wisconsin found that, "[a]s the manager of the various entities, [Mr.] Spangenberg requests funds from Plutus and authorizes funds to be disbursed from Plutus.  For example, as manager of Taurus, [Mr.] Spangenberg might ask [Mr.] Spangenberg, as man[a]ger of Plutus, for an advance, at which point [Mr.] Spangenberg will decide whether to grant [Mr.] Spangenberg's request." 559 F. Supp. 2d at 953.  The court "conclude[d] that [Mr.] Spangenberg has managed Orion for his personal gain in disregard of Orion's legal responsibility.... Moreover, [Mr.] Spangenberg received a personal benefit from Orion's breach." *Id.* at 960-61.  While denying a motion to pierce the corporate veil of a corporation owned and controlled by Mr. Spangenberg, the court enjoined Mr. Spangenberg from "dissipating Orion's assets," admonishing Mr. Spangenberg that "[u]nexplained transfers of Orion's assets that result in Orion's insolvency will not be tolerated." *Id.* at 961.

WASH_6395668.1

38.    In *Taurus IP, LLC v. DaimlerChrysler Corp.*, 519 F. Supp. 2d 905 (W.D. Wis. 2007), the court observed:

a.    "Third party defendant Spangenberg controls third party defendants Orion IP, Constellation IP, Taurus IP, Plutus IP and Plutus IP Wisconsin on behalf of a parent entity, Acclaim[ ] Financial Group, LLC, which is owned by [Mr.] Spangenberg's wife and son.  Capital flows to the corporations and companies on an 'as needed basis,' and licensing revenue flows to Acclaim[ ] Financial Group, LLC." *Id.* at 917.

b.    "[Mr.] Spangenberg forms companies such as third party defendants Orion IP and Taurus IP with minimal capital.  For example, plaintiff was formed with $1,000 provided by third party defendant Plutus IP's predecessor Plutus IP Holdings.  Patents are assigned to the companies in transactions for which third party defendant [Mr.] Spangenberg could not describe any exchange of valuable consideration." *Id.*

c.    "From their amended counterclaims and supplemental evidence, I conclude that defendants have established a prima facie case that third party defendant [Mr.] Spangenberg used the nonpracticing entities, including Orion IP and its predecessor Orion IP Delaware, Constellation IP and its predecessor Caelum IP, Plutus IP and its predecessor Plutus IP Holdings, and plaintiff Taurus IP to perpetrate a fraud.  Third party defendant [Mr.] Spangenberg directed Orion IP Delaware to transfer the *'658 patent* to Caelum IP five days after directing Orion IP Delaware to file the first lawsuit

WASH_6395668.1

against defendant DaimlerChrysler. Three days before settlement talks began in that lawsuit, [Mr.] Spangenberg directed Caelum IP to merge into Constellation IP and assign the *'658 patent* to the new company. During settlement talks, [Mr.] Spangenberg represented, on Orion IP Delaware's behalf, that the settlement would be comprehensive. Finally, at [Mr.] Spangenberg's direction, Plutus IP Holdings provided $ 1,000 to form plaintiff, which subsequently filed the present suit." *Id.* at 920.

## JURISDICTION

39.     This Court has subject matter jurisdiction over Foley & Lardner's First Amended Counterclaims, Third-Party Complaint, and Cross-Claims pursuant to 28 U.S.C. § 1332(a)(1) because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

40.     This Court has subject matter jurisdiction over Foley & Lardner's First Amended Counterclaims, Third-Party Complaint, and Cross-Claims pursuant to 28 U.S.C. § 1367(a) pursuant to the doctrine of supplemental jurisdiction.

41.     This Court has personal jurisdiction over the Datatern Parties for the following reasons:

      a.     The Lawsuit was filed in this Court, as were Plaintiffs' Complaint and Plaintiffs' First Amended Complaint in the pending action.

      b.     Datatern is a resident of the State of Texas.

      c.     The Datatern Parties regularly transact and conduct business in the State of Texas.

WASH_6395668.1

d. The Fee For Legal Services Agreement which is the subject of Foley & Lardner's First Amended Counterclaims, Third-Party Complaint, and Cross-Claims contemplated performance, was performed, and was breached in the State of Texas, at least in part.

e. The unjust enrichment and fraud of which Foley complains occurred, at least in part, in the State of Texas.

42. This Court has personal jurisdiction over the Plutus Parties because they reside in and/or regularly transact and conduct business in the State of Texas, and because the fraud, tortious interference, and unjust enrichment of which Foley & Lardner complains occurred, at least in part, in the State of Texas.

## **VENUE**

43. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (c), and by virtue of the Datatern Parties' commencement of the present action in this Court.

## **FACTS COMMON TO ALL CLAIMS**

### **(Foley & Lardner's Fee For Legal Services Agreement to Represent the Datatern Parties in the Lawsuit in the Eastern District of Texas)**

44. As alleged in the Datatern Parties' original Complaint filed in this Court, Foley & Lardner and the Datatern Parties were parties to a contract whereby Foley & Lardner agreed "to represent Plaintiffs in the Lawsuit." (Complaint ¶ 8). Hereinafter the "Agreement" or "Contract" described in the

20

Datatern Parties' original Complaint is referred to as the "Fee For Legal Services Agreement."

45.    Pursuant to the Fee For Legal Services Agreement, the Datatern Parties agreed to pay Foley & Lardner's "reasonable hourly rates." (Complaint ¶ 8).

46.    Pursuant to the Fee For Legal Services Agreement, Foley & Lardner proposed — and the Datatern Parties agreed to — a litigation budget of $4.4 million.

47.    The Datatern Parties failed to honor their contractual obligations to Foley & Lardner pursuant to the Fee For Legal Services Agreement.

48.    Nevertheless, Foley & Lardner continued to diligently and zealously look out for the best interests of the Datatern Parties in the Lawsuit.

### (Foley & Lardner's Representation of
### The Datatern Parties in the Lawsuit)

49.    In early 2006, while developing a commodities trading software product ("Trading Platform"), FireStar concluded that a software product called "Hibernate" available from another vendor, JBoss, infringed U.S. Patent 6,101,502 (the '502 patent). The '502 patent was, at the time, owned by FireStar.

50.    The application for the '502 patent was a non-provisional application based upon two provisional applications, each of which named several inventors, but contained no patent claims.

51.    The non-provisional application, which matured into the '502 patent, had one inventor common to all the provisional applications.

21

52.    FireStar and Amphion contacted Foley & Lardner around April 2006 for the purpose of taking action to enforce the '502 patent against the Hibernate product and its owner.

53.    Foley & Lardner pointed out to FireStar that, as a result of the difference in the names of the inventors between the provisional and non-provisional applications, the defendant was likely to assert improper inventorship as a defense to an infringement action.

54.    To address the foregoing concern, Foley & Lardner interviewed several (but not all) of the inventors of the '502 patent, their supervisors at the time the applications were filed, and another party who was not a named inventor on any of the applications.  Foley & Lardner determined at that time that there was no basis to conclude that the inventorship on the '502 patent was incorrect and that there was no basis to support a defense that the named inventors intended to perpetuate a fraud concerning inventorship.

55.    The alleged infringing Hibernate product is an "open source" product, which JBoss made available for download by anyone for free.

56.    After evaluating FireStar's infringement allegations, Foley & Lardner agreed to represent FireStar and Amphion in enforcing the '502 patent.

57.    On May 26, 2006, with the authorization of FireStar and Amphion, Foley & Lardner wrote to the CEO of JBoss, Mark Fluery, concerning the infringement allegations.

58.    Around that time, it became publicly known that Red Hat, Inc. ("Red Hat"), another provider of open source software, was acquiring JBoss or its assets, including Hibernate.

59.    On June 7, 2006, with the authorization of FireStar and Amphion, Foley & Lardner wrote to the CEO of Red Hat advising him of the allegations that the Hibernate product infringed the '502 patent.

60.    Without responding to Foley & Lardner's letter, Red Hat completed the purchase of JBoss and the Hibernate product.

61.    Published reports and public filings indicated that Red Hat paid approximately $430 million to acquire JBoss and had set aside an escrow of about $43 million for contingencies and future claims.   The contingencies and future claims for which the escrow was established consisted of FireStar's claim for infringement of the '502 patent.

62.    At the request of FireStar and Amphion, Foley & Lardner prepared a complaint and, through local counsel, filed suit against Red Hat and JBoss on June 26, 2006 in the U.S. District Court for the Eastern District of Texas, Marshall Division.   On instructions from FireStar and Amphion, Foley & Lardner did not immediately serve the complaint.

63.    In early July 2006, FireStar and Amphion made a technical presentation to Foley & Lardner concerning infringement of the '502 patent by Hibernate.   The presentation contained no suggestion that Red Hat infringed any other intellectual property of FireStar and Amphion.

23

64.    In late July 2006, FireStar advised Amphion and Foley & Lardner that it was evaluating whether any other patent owned by FireStar could be the subject of a suit against Red Hat.   FireStar provided no further indication to Foley & Lardner that it had reason to believe Red Hat was infringing any other patent owned by FireStar at that time.   On subsequent occasions, FireStar, or its designee, indicated to Foley & Lardner that no other patents were implicated in the suit against Red Hat.

65.    In the period from July 2006 through October 2006, FireStar and Amphion negotiated with Red Hat on four "tracks" — a technical track (Track A); a compensation track (Track B); a synergies and business partnering track (Track C); and a track involving discussions between members of the upper management of Red Hat and Amphion and FireStar (Track X).

66.    FireStar and Amphion invited Foley & Lardner to participate in some, but not all, of the negotiations with Red Hat.

67.    During the negotiations with Red Hat, Foley & Lardner advised FireStar and Amphion that the cost of a suit against Red Hat could be $4 million or more.

68.    During the negotiations, Foley & Lardner had several lengthy discussions with representatives of FireStar and Amphion about the pros and cons of pursuing actions against Red Hat's customers and other users of Hibernate. Among the topics included in those discussions was the fact that some Hibernate users might be clients of Foley & Lardner, and that ethical conflicts could prevent

24

Foley & Lardner from suing Hibernate users who were also Foley & Lardner clients.

69.    Foley & Lardner also specifically discussed whether a settlement should include a license to Red Hat's customers.  Foley & Lardner explained to FireStar and Amphion that a settlement which included granting licenses to Red Hat's customers should require Red Hat to pay a substantially higher amount than a settlement which did not grant licenses to Red Hat's customers.  Foley & Lardner also speculated that Red Hat was unlikely to agree to a settlement which did not protect Red Hat's customers.  Foley & Lardner also advised FireStar and Amphion that the likelihood of settling quickly with Red Hat decreased as the amount demanded for settlement increased.

70.    FireStar and Amphion engaged a public relations firm to consider how to proceed with the litigation and the public posture FireStar and Amphion would take concerning the litigation.

71.    The public relations firm advised FireStar and Amphion that — in order to maintain FireStar's credibility as a product developer and to avoid alienating potential FireStar customers — FireStar and Amphion should take the position that FireStar was a reluctant plaintiff, acting solely to protect its intellectual property rights.  The public relations firm also advised FireStar and Amphion that they should avoid being perceived as "patent trolls."

72.    In view of their desire to forge a business relationship with Red Hat and the public relations firm's advice that FireStar should be a reluctant plaintiff,

25

FireStar and Amphion decided not to sue other potential defendants.  FireStar and Amphion thus instructed Foley & Lardner to pursue the action solely against Red Hat.

73.    During the negotiations with Red Hat, Foley & Lardner also had numerous discussions with FireStar and Amphion about licensing and damages models.

74.    FireStar and Amphion could not reach a consensus on a licensing model or damages approach and never authorized Foley & Lardner to hire any damages or licensing experts or any technical experts.

75.    In October 2006, FireStar and Amphion wrote to Red Hat stating that compensation of $100 million for Hibernate's infringement of the '502 patent would be appropriate.  Red Hat responded that there was nothing left to discuss and negotiations terminated.

76.    At the instructions of FireStar and Amphion, Foley & Lardner served the suit on Red Hat in November 2006.

77.    In January 2007, Sun Microsystems petitioned the U.S. Patent and Trademark Office ("USPTO") for re-examination of the '502 patent.

78.    FireStar and Amphion concluded that the prior art in Sun's re-examination request was likely the "best" prior art which would be located and elected to engage the attorney who prosecuted the '502 patent application to issuance to prosecute the re-examination in the USPTO, while Foley & Lardner

WASH_6395668.1

continued with the Red Hat litigation. The '502 patent was ultimately upheld on re-examination by the USPTO.

79. In February 2007, Foley & Lardner gave FireStar and Amphion a written litigation estimate of approximately $4.4 million to prosecute the Lawsuit through trial. FireStar and Amphion agreed to this amount and in fact expressed a willingness to spend between $5 million and $10 million on the Lawsuit.

80. Throughout the litigation, Foley & Lardner monitored third party discovery taken by Red Hat. Most of Red Hat's discovery involved Red Hat's attempts to locate invalidating prior art, or to investigate inventorship issues or other issues relating to FireStar's predecessor in interest.

81. Since the Hibernate product is an "open source" product, the source code Foley & Lardner needed to demonstrate that Hibernate infringed was freely available for download over the Internet.

82. In May 2007, the court ordered FireStar to serve its infringement contentions and produce documents by early June 2007. Before serving the infringement contentions and producing documents, Foley & Lardner met extensively with FireStar engineers and software development managers. Foley & Lardner received approval from FireStar before it served any infringement contentions or produced any documents.

83. With the knowledge of FireStar and Amphion, Foley & Lardner engaged various vendors to assist with electronic discovery activities, including identifying, obtaining, and preserving files on FireStar's computers and servers.

WASH_6395668.1

These activities also included reviewing thousands of FireStar e-mails for privilege, confidentiality, and relevance to the '502 patent and FireStar products; sales of products that may have implemented techniques disclosed in the '502 patent; and numerous other criteria.

84.    As discovery progressed, Foley & Lardner created several databases of documents, which could be used with commercially available software, for Foley & Lardner's use in producing and analyzing the documents in the case.

85.    Foley & Lardner also incorporated the document databases into its own proprietary litigation software.

86.    Foley & Lardner obtained discounted rates of $52.80 per hour for contract attorneys to conduct much of the review of FireStar's e-mails.

87.    Foley & Lardner routinely passed discovery and litigation services vendors' bills on to FireStar and Amphion without any mark up or processing fee, for direct payment by FireStar and Amphion.

88.    Foley & Lardner required cooperation from FireStar's engineers and management to formulate focused discovery requests, which Foley & Lardner served on Red Hat; to respond to Red Hat's discovery requests; to locate documents; and to assist in developing claim construction positions.

89.    At some point, FireStar and Amphion reached an agreement under which Amphion would pay FireStar for the time FireStar's engineers spent on the Lawsuit.

28

90.    After Red Hat served its invalidity contentions, Foley & Lardner's claim construction related activities required additional attention from FireStar's engineers and managers.

91.    Throughout the Lawsuit, Foley & Lardner regularly sent its invoices to Amphion as instructed, but they went unpaid.  Amphion also failed to pay the invoices from vendors and local counsel which Foley & Lardner sent to Amphion.

92.    In December 2007, Foley & Lardner met with Amphion in New York to review the status of the case, the expenditures to date, and the budget.  At that time, the total litigation expenditures were slightly below budget.  Amphion gave no indication it could not afford to continue the litigation or that it was dissatisfied with the representation.  To the contrary, Amphion instructed Foley & Lardner to press on.

93.    The instructions that Foley & Lardner received from Amphion in December 2007 were consistent with earlier instructions in which Amphion told Foley & Lardner during a discovery dispute to advise Red Hat that FireStar and Amphion were prepared to spend $5 or $10 million to win the case.

94.    Amphion, however, still did not pay the invoices it received from Foley & Lardner or the invoices that Foley & Lardner passed on to Amphion to pay directly to the vendors and local counsel.

95.    Around the same time, Amphion expressed concern to Foley & Lardner that FireStar's engineers were focused on product development rather than the Red Hat case and as a result were not sufficiently responsive to matters concerning the

WASH_6395668.1

Lawsuit.   Amphion also expressed concern to Foley & Lardner that FireStar's charges to Amphion for the Red Hat case were excessive.   Therefore, in January 2008, Amphion informed Foley & Lardner that it was engaging a technical consultant to focus FireStar on the Red Hat case and to act as a technical liaison for Foley & Lardner to get faster responses.

96.    In December 2007 or thereabouts, Amphion purchased intellectual property rights to FireStar's Object Spark software and FireStar's patent portfolio, including the '502 patent.   In February 2008, Amphion purportedly assigned the patents to what it represented to be a new entity, allegedly owned by Amphion, called Datatern.   Foley & Lardner recorded the assignment with the USPTO.   Foley & Lardner had no reason at that time to doubt whether Datatern was in fact owned and controlled by Amphion or whether it in fact existed.

97.    At that time, Amphion informed Foley & Lardner that Datatern would continue to pursue the Lawsuit, leaving FireStar to focus on its product development efforts.   Amphion also informed Foley & Lardner that Datatern would engage in product development efforts related to the ObjectSpark software.   As of the time of the representations, Amphion knew they were false.   Moreover, Datatern did not even exist at that time.   In fact, it was not incorporated until April 15, 2008.

98.    At no time did Amphion and FireStar advise Foley & Lardner about any change in the previously adopted strategy of being "reluctant plaintiffs."

WASH_6395668.1

99.    In January 2008, Foley & Lardner continued with the claim construction phase of the Lawsuit, exchanging proposed terms for construction with Red Hat's counsel, meeting with FireStar and the consultant on the pros and cons of various claim construction positions, and advising as to the consequences of Red Hat's claim construction proposals.

100.    By the end of January 2008, neither Amphion nor FireStar nor Datatern had paid $1,427,338.80 of Foley & Lardner's invoices for legal services through December 31, 2007.  On or about January 31, 2008, at Foley & Lardner's insistence, Amphion paid $462,497.81 of which $373,660.28 was applied to FireStar's outstanding balance of $1,338,501.27 for the Lawsuit.

101.    In February 2008, Foley & Lardner interviewed experts, identified a testifying technical expert to Datatern and Amphion, and sent the technical expert a proposed engagement letter.  Amphion and Datatern would not, however, to authorize Foley & Lardner to engage the technical expert to testify in the Lawsuit.

102.    Foley & Lardner also discussed with Datatern and Amphion retaining a damages consultant.  Datatern and Amphion mentioned a damages consultant with whom Foley & Lardner had worked as a testifying witness in an unrelated case.  Foley & Lardner then suggested engaging that consultant as a testifying witness.  Amphion never authorized Foley & Lardner to engage the damages consultant in any capacity.

103.    Around this time, Amphion informed Foley & Lardner that its efforts to raise capital for Datatern had failed to produce investors, and that it was

31

considering an alternative source of funding and an alternative business model. Contrary to its prior, repeated representations to Foley & Lardner, Amphion indicated that it was now reluctant to expend its own funds to prosecute the Lawsuit while it looked for investors.

### (The Appearance of the Plutus Parties' Counsel in the Lawsuit For the Purpose of Defrauding Foley & Lardner, Misappropriating Its Work Product, and Tortious Interference)

104.    In late February 2008, the Datatern Parties advised Foley & Lardner that they had reached an agreement with a third party unrelated to the Datatern Parties to fund the Lawsuit.  The Datatern Parties also informed Foley & Lardner that new attorneys would be entering an appearance in the Lawsuit on their behalf. These new attorneys were Messrs. Anderson and Perez.

105.    In early March 2008, the Datatern Parties advised Foley & Lardner that Messrs. Anderson and Perez would be taking charge of the Lawsuit and making all decisions.

106.    Since Foley & Lardner was no longer in charge of the Lawsuit, Foley & Lardner requested permission to withdraw its appearance and representation after a reasonable transition period.

107.    The Datatern Parties refused Foley & Lardner's request on the basis that Foley & Lardner's work product, experience, and knowledge of the Lawsuit were important.  Still, Foley & Lardner's invoices remained unpaid.

108.    Foley & Lardner offered to provide the contents of its databases to the new attorneys, Messrs. Anderson and Perez.  Foley & Lardner was advised by the

32

Datatern Parties, however, that the new attorneys did not have any litigation support software.

109.   At the request of the Datatern Parties, Foley & Lardner then granted the new attorneys unrestricted remote access to Foley & Lardner's extensive work product and document databases through Foley & Lardner's proprietary litigation software systems.  Foley & Lardner developed its proprietary litigation software at its own expense to give Foley & Lardner a competitive advantage in the litigation services market.  Foley and Lardner's proprietary litigation software is not intended for use by other attorneys.  Foley & Lardner's databases were the product of intense discovery efforts.  These databases included paper and electronic documents found at FireStar, FireStar's e-mails, documents produced by Red Hat, pleadings, discovery, and numerous other documents.

110.   Although Foley & Lardner's invoices remained unpaid, the new attorneys representing the Datatern Parties regularly used Foley & Lardner's proprietary litigation software to access Foley & Lardner's databases of documents and pleadings.  The new attorneys relied heavily on Foley & Lardner's databases and work product to learn about the Lawsuit and the discovery which had been taken by both sides in the litigation.

111.   Foley & Lardner became concerned that the new attorneys were taking positions that were inconsistent with the litigation objectives of the Datatern Parties as they had previously been stated by FireStar and Amphion.  For example, the new attorneys made unilateral offers to withdraw proposals to construe certain

33

claim terms which Foley & Lardner considered important to prevailing on the merits. Red Hat, in contrast, made no similar offers.

112. Foley & Lardner was also concerned that the new attorneys had determined to take a key deposition of the creator of the Hibernate product prematurely.

113. Foley & Lardner made several additional requests for permission to withdraw along with specific proposals to transition the work. The Datatern Parties denied all of Foley & Lardner's requests, even though the Datatern Parties continued to make no payment of Foley & Lardner's invoices.

114. The Datatern Parties subsequently requested that Foley & Lardner review the draft claim construction briefs prepared by the new attorneys.

115. Notwithstanding the failure of the Datatern Parties to pay Foley & Lardner's outstanding invoices, Foley & Lardner made extensive edits to the briefs and received thanks from the Datatern Parties for Foley & Lardner's expeditious review and professional conduct.

116. Foley & Lardner eventually transferred its database files on hard media to the new attorneys.

117. Although Foley & Lardner never received permission to withdraw, Foley & Lardner learned through the media that the Lawsuit had been settled. Foley & Lardner was not consulted concerning any of the terms of the settlement and did not participate in the settlement negotiations.

WASH_6395668.1

**(The Plutus Parties' Settlement of the Lawsuit
On Terms Disadvantageous to the Datatern Parties
That Unjustly Enriched the Plutus Parties)**

118.  The Plutus Parties settled the Datatern Parties' claims for approximately ten cents on every dollar that had been reserved by Red Hat for payment of the Datatern Parties' patent infringement claims.  Of the $4.2 million settlement that the Plutus Parties obtained on behalf of the Datatern Parties, the Plutus Parties took the equivalent of an 80 percent contingent fee.  The $3.4 million contingent fee was denominated as being for "consulting services" performed during a brief period by one of the Plutus Parties, IP Navigation.

119.  Plaintiffs — who had previously agreed to a litigation budget of $4.4 milion and expressed a willingness to spend more than twice that amount if necessary — were not willing to accept $4.2 million in settlement before coming under the control of the Plutus Parties.  If they had been, Foley & Lardner could have obtained a settlement of this amount without the expenditure of much in the way of legal fees.

120.  As a result of the wrongful conduct by the Plutus Parties alleged herein, the Datatern Parties have breached their agreement to pay Foley & Lardner $1,571,038.63 (plus interest), and the Plutus Parties have been unjustly enriched in the amount of at least $3.4 million.  This $3.4 million figure does not include subequent payments to the Plutus Parties in connection with subsequent claims for infringement of the '502 patent.

WASH_6395668.1

**(Foley & Lardner's Unsuccessful Efforts to Secure Compliance
With The Datatern Parties' Contractual Obligations
Under the Fee For Legal Services Agreement)**

121.    Following settlement of the Lawsuit, Foley & Lardner contacted the
Datatern Parties numerous times by e-mail, phone, letter, and personal meeting to
request payment for the legal services Foley & Lardner duly and loyally rendered.

122.    As recently as January 2009, Foley & Lardner offered the Datatern
Parties a substantial discount in return for their agreeing to an installment
payment plan that would retire the debt by the end of 2010.

123.    The Datatern Parties refused Foley & Lardner's proposed installment
payment plan.  Instead, the Datatern Parties offered to pay Foley & Lardner half
the discounted amount by the end of 2009, but the remainder would only be paid
when, if ever, Datatern reached certain income milestones.   These income
milestones are wholly out of the control of Foley & Lardner.  These milestones are
also not controlled by the Datatern Parties, since they are strictly dependent upon
the actions of the Plutus Parties to enforce the patent portfolio owned by the
Datatern Parties.

124.    The Datatern Parties paid only a fraction of Foley & Lardner's invoices
in January 2008.  The bulk of Foley & Lardner's invoices tendered before January
2008, along with all of Foley and Lardner's invoices tendered after January 2008,
remain unpaid.  During this entire time, the Datatern Parties benefitted from Foley
& Lardner's legal services.   Even after the appearance of Messrs. Anderson and
Perez as counsel of record, the Datatern Parties demanded that Foley & Lardner
remain in the case and continue to provide advice and counsel.  Many of the vendor

36

invoices Foley & Lardner sent to the Datatern Parties also remain unpaid. Meanwhile, work product has been misappropriated for the benefit of the Datatern Parties and the Plutus Parties.

## FIRST COUNTERCLAIM AGAINST THE DATATERN PARTIES

### (Breach of Contract)

125.   Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-124 by reference as if fully set forth herein.

126.   A valid and enforceable contract, the Fee For Legal Services Agreement, existed between Foley & Lardner and the Datatern Parties.

127.   Foley & Lardner fully and adequately performed all its obligations under the Fee For Legal Services Agreement.

128.   By failing to pay Foley & Lardner for professional services, costs, and expenses the Datatern Parties have, jointly and severally, breached their duties under the Fee For Legal Services Agreement.

129.   The Datatern Parties' breach has caused Foley & Lardner injury. Under the Fee for Legal Services Agreement, the Datatern Parties owe Foley & Lardner $1,571,038.63.

130.   Foley & Lardner is entitled to judgment against the Datatern Parties, jointly and severally, in the amount of $1,571,038.63 plus interest.

37

## SECOND COUNTERCLAIM AGAINST THE DATATERN PARTIES

### (Unjust Enrichment)

131.   Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-130 by reference as if fully set forth herein.

132.   Foley & Lardner and the vendors provided goods and services to the Datatern Parties for which Foley & Lardner and the vendors reasonably expected to be paid.

133.   The Datatern Parties received regular invoices from Foley & Lardner and the vendors and received benefits of the goods and services from Foley & Lardner and the vendors over an extended time and in a manner such that the Datatern Parties knew Foley & Lardner and the vendors expected to be paid.

134.   By their receipt of goods and legal services from Foley & Lardner and the goods and services of vendors, the Datatern Parties, jointly and severally, have received a benefit.

135.   The Datatern Parties, jointly and severally, knowingly received the benefits of Foley & Lardner's goods and legal services and the goods and services of vendors.

136.   The Datatern Parties obtained this benefit through fraudulent acts and the taking of an undue advantage.

137.   Retention of the benefits received from Foley & Lardner and the vendors by the Datatern Parties would be unjust without payment.

138.   The Datatern Parties' unjust enrichment has damaged Foley & Lardner.

WASH_6395668.1

139.    Foley & Lardner is entitled to judgment, jointly and severally, against the Datatern Parties in the amount of at least $1,571,038.63 plus interest.  This figure does not include unjust enrichment resulting from use of Foley & Lardner's work product in subsequent claims against various third parties for infringement of the '502 patent.

## THIRD COUNTERCLAIM AGAINST THE DATATERN PARTIES

### (*Quantum Meruit*)

140.    Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-139 by reference as if fully set forth herein.

141.    Foley & Lardner and the vendors rendered valuable services, including legal counseling and litigation services, and delivered valuable materials and goods, including databases and other materials, to the Datatern Parties and the Datatern Parties' designees.  These designees included the new attorneys retained at the behest of the Plutus Parties, ostensibly to represent the Datatern Parties in the Lawsuit.

142.    These services and materials and goods delivered by Foley & Lardner and the vendors were delivered to the Datatern Parties from which Foley & Lardner seeks recovery.

143.    The services and materials and goods delivered by Foley & Lardner were accepted by the Datatern Parties over an extended time period and used and enjoyed by the Datatern Parties.

39

144. Foley & Lardner regularly forwarded its invoices and the vendors' invoices to the Datatern Parties without any objection or protest from the Datatern Parties, in a manner and form and over a duration such that the Datatern Parties were reasonably notified that Foley & Lardner and the vendors were expecting payment.

145. On the basis of *quantum meruit*, Foley & Lardner is entitled to judgment in the amount of $1,571,038.63 plus interest. This figure does not include unjust enrichment resulting from use of Foley & Lardner's work product in subsequent claims against various third parties for infringement of the '502 patent.

## FOURTH COUNTERCLAIM AGAINST THE DATATERN PARTIES
### (Fraud)

146. Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-145 by reference as if fully set forth herein.

147. The Datatern Parties made numerous, material false statements and misrepresentations to Foley & Lardner concerning funding of litigation against Red Hat and payment to Foley & Lardner and the vendors for legal services and related goods.

148. The Datatern Parties made these false statements and representations knowing they were false.

149. The Datatern Parties made these false statements and representations with the intent that Foley & Lardner rely upon them.

40

150.    Foley & Lardner did rely on the false statements and representations the Datatern Parties made to Foley and Lardner.

151.    As a result of the false statements the Datatern Parties made to Foley & Lardner, and its reliance on those false statements and representations, Foley and Lardner has suffered damages.

152.    Foley & Lardner is entitled to compensatory damages against the Datatern Parties in the amount of at least $1,571,038.63 plus interest.

## ATTORNEYS' FEES AND EXEMPLARY DAMAGES

153.    Foley & Lardner incorporates the allegations of the foregoing paragraphs 1-152 above by reference as if fully set forth herein.

154.    The Datatern Parties have breached the Fee For Legal Services Agreement, allowing Foley & Lardner to seek and recover attorneys' fees from the Datatern Parties, jointly and severally, as stated herein.

155.    The Datatern Parties have been unjustly enriched, allowing Foley & Lardner to seek and recover attorneys' fees from the Datatern Parties, jointly and severally, as stated herein.

156.    Foley & Lardner is entitled to judgment on the basis of *quantum meruit*, allowing Foley & Lardner to seek and recover attorneys' fees from the Datatern Parties, jointly and severally, as stated herein.

157.    The foregoing actions and omissions of the Datatern Parties have necessitated the employment by Foley & Lardner of outside counsel, as well as Foley & Lardner attorneys.    Foley & Lardner is entitled to recover from the

41

Datatern parties, jointly and severally, reasonable attorneys' fees, costs, and expenses incurred herein and on appeal.

158. The Datatern Parties have committed acts of fraud for which Foley & Lardner is entitled to recover exemplary damages.

159. By bringing these causes of action, Foley & Lardner does not waive or release any rights, claims, causes of action, or defenses, or make any election of remedies, which it now has or may have, against the Datatern Parties, but expressly reserves all such rights, claims, causes of action and defenses, whether or not the same have been asserted or may hereafter be asserted in this or any other proceeding.

## COUNTERCLAIM PRAYER FOR RELIEF

WHEREFORE, Foley & Lardner  prays for the following relief:

(A)    Judgment dismissing Plaintiffs' Complaint and Plaintiffs' First Amended Complaint with prejudice in their entirety;

(B)    On Foley & Lardner's First Counterclaim, the Datatern Parties be ordered, jointly and severally, to pay damages in an amount to be determined at trial, but not less than $1,571,038.63;

(C)    On Foley & Lardner's Second Counterclaim, the Datatern Parties be ordered, jointly and severally, to pay damages in an amount to be determined at trial, but not less than $1,571,038.63;

WASH_6395668.1

(D)    On Foley & Lardner's Third Counterclaim, the Datatern Parties be ordered, jointly and severally, to pay damages in an amount to be determined at trial, but not less than $1,571,038.63;

(E)    On Foley & Lardner's Fourth Counterclaim, the Datatern Parties be ordered, jointly and severally, to pay compensatory damages in an amount to be determined at trial, but not less than $1,571,038.63, plus exemplary damages in an amount not less than $3,400,000.00;

(F)    An accounting of all payments made and received in connection with claims for infringement of the '502 patent and other patent infringement claims, including all such payments to and from the Datatern Parties, all such payments to and from the Plutus Parties, all such payments to and from Messrs. Anderson and Perez, and all such payments received from third parties;

(G)    The imposition of a constructive trust on the '502 patent and all licensing fees and other revenues generated therefrom until such time as Foley & Lardner's claims for compensatory damages, exemplary damages, and costs and attorneys' fees are fully adjudicated and paid in full;

(H)    The Datatern Parties be ordered to pay pre- and post-judgment interest, attorneys' fees at the highest rate and to the maximum extent provided by law, and costs and disbursements incurred by Foley & Lardner in connection with this action;

(I)    The Datatern Parties be ordered, jointly and severally, to pay exemplary damages to the maximum extent provided by law; and

43

(J)    For such other and further relief, both special and general, as this court may deem just and proper.

## FIRST THIRD-PARTY CLAIM AND CROSS-CLAIM AGAINST THE PLUTUS PARTIES

### (Tortious Interference With Contract and Business Relationship)

160.    Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-159 by reference as if fully set forth herein.

161.    A valid and enforceable contract existed between Foley & Lardner and the Datatern Parties.

162.    By taking control of the Datatern Parties, taking charge of the Lawsuit, and causing the Datatern Parties not to pay Foley & Lardner, the Plutus Parties willfully and intentionally engaged in fraudulent conduct, employed wrongful means and otherwise  took action to cause the Datatern Parties to breach the Fee For Legal Services Agreement and to interfere with the attorney-client business relationship between Foley & Lardner and the Datatern Parties.

163.    The Plutus Parties' interference with Foley & Lardner's contract and business relationship with the Datatern Parties has caused Foley & Lardner injury.

164.    Foley & Larder is entitled to judgment, jointly and severally, against the Plutus Parties for compensatory damages and for exemplary damages sufficient to punish and deter the Plutus Parties, taking into account their income and net worth.

165.    While denying liability to the Datatern Parties with respect to the allegations of Plaintiffs' Complaint and Plaintiffs' First Amended Complaint, Foley

44

& Lardner states that the Plutus Parties are liable to Foley & Lardner for such liability.

## SECOND THIRD-PARTY CLAIM AND CROSS-CLAIM AGAINST THE PLUTUS PARTIES

### (Unjust Enrichment)

166.    Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-165 by reference as if fully set forth herein.

167.    Foley & Lardner and the vendors provided goods and services to the Datatern Parties for which Foley & Lardner and the vendors reasonably expected to be paid.  These goods and services were ultimately misappropriated by the Plutus Parties for their own benefit.

168.    By their receipt of goods and legal services provided by Foley & Lardner vendors, the Plutus Parties, jointly and severally, have received a benefit.

169.    The Datatern Parties, jointly and severally, knowingly received the benefits of Foley & Lardner's goods and legal services and the goods and services of vendors.

170.    The Plutus Parties obtained these benefits through fraudulent acts and the taking of an undue advantage.

171.    It would be unjust for the Plutus Parties to retain the benefits received from Foley & Lardner and the vendors without payment.

172.    The Plutus Parties' unjust enrichment has damaged Foley & Lardner.

173.    Foley & Lardner is entitled to judgment, jointly and severally, against the Plutus Parties, jointly and severally, in the amount of at least $3,400,000.00.

45

174.    While denying liability to the Datatern Parties with respect to the allgations of Plaintiffs' Complaint and Plaintiffs' First Amended Complaint, Foley & Lardner states that the Plutus Parties are liable to Foley & Lardner for such liability.

## THIRD THIRD-PARTY CLAIM AND CROSS-CLAIM AGAINST THE PLUTUS PARTIES

### (*Quantum Meruit*)

175.    Foley & Lardner incorporates the allegations of the foregoing Paragraphs 1-174 by reference as if fully set forth herein.

176.    Foley & Lardner and the vendors rendered valuable services, including legal counseling and litigation services, and delivered valuable materials and goods, including databases and other materials, to the Plutus Parties and the Plutus Parties' designees, including Messrs. Anderson and Perez.

177.    These services and materials and goods delivered by Foley & Lardner and the vendors were delivered to the Plutus Parties from which Foley & Lardner seeks recovery.

178.    The services and materials and goods delivered by Foley & Lardner were accepted by the Plutus Parties over an extended time period and used and enjoyed by the Plutus Parties.

179.    Foley & Lardner regularly forwarded its invoices and the vendors' invoices to the Plutus Parties, by and through the Datatern Parties, without any objection or protest from the Plutus Parties, in a manner and form and over a

WASH_6395668.1

duration such that the Plutus Parties were reasonably notified that Foley & Lardner and the vendors were expecting payment.

180. On the basis of *quantum meruit*, Foley & Lardner is entitled to judgment in the amount of at least $1,571,038.63 plus interest.

181. While denying liability to the Datatern Parties with respect to the allegations of Plaintiffs' Complaint and Plaintiffs' First Amended Complaint, Foley & Lardner states that the Plutus Parties are liable to Foley & Lardner for such liability.

## ATTORNEYS' FEES AND EXEMPLARY DAMAGES

182. Foley & Lardner incorporates the foregoing allegations of Paragraphs 1-181 by reference as if fully set forth herein.

183. The Plutus Parties have tortiously interfered with Foley & Lardner's Fee For Legal Services Agreement and business relationship with the Datatern Parties, allowing Foley & Lardner to seek and recover attorneys' fees from the Plutus Parties, jointly and severally, as stated herein.

184. The Plutus Parties have been unjustly enriched, allowing Foley & Lardner to seek and recover attorneys' fees from the Plutus Parties, jointly and severally, as stated herein.

185. Foley & Lardner is entitled to judgment on the basis of *quantum meruit*, allowing Foley & Lardner to seek and recover attorneys' fees from the Plutus Parties, jointly and severally, as stated herein.

WASH_6395668.1

186.   The foregoing actions and omissions of the Plutus Parties have necessitated the employment by Foley & Lardner of the outside counsel, as well as Foley & Lardner attorneys.   Foley & Lardner is entitled to recover from the Plutus parties, jointly and severally, reasonable attorneys' fees, costs, and expenses incurred herein and on appeal.

187.   By bringing these causes of action, Foley & Lardner does not waive or release any rights, claims, causes of action, or defenses, or make any election of remedies, which it now has or may have, against the Plutus Parties, but expressly reserves all such rights, claims, causes of action, and defenses, whether or not the same have been asserted or may hereafter be asserted in this or any other proceeding.

## **PRAYER FOR RELIEF**

WHEREFORE, Foley & Lardner  prays for the following relief:

A.   On Foley & Lardner's First Third-Party Claim and Cross-Claim, the Plutus Parties be ordered, jointly and severally, to pay damages in an amount to be determined at trial, but not less than $1,571,038.63;

B.   On Foley & Lardner's Second Third-Party Claim and Cross-Claim, the Plutus Parties be ordered, jointly and severally, to pay damages in an amount to be determined at trial, but not less than $3,400,000.00;

C.   On Foley & Lardner's Third Third-Party Claim and Cross-Claim, the Plutus Parties be ordered, jointly and severally, to pay damages in an amount to be determined at trial, but not less than $3,400,000.00;

48

D.     An accounting of all payments made and received in connection with claims for infringement of the '502 patent and other patent infringement claims, including all such payments to and from the Datatern Parties, all such payments to and from the Plutus Parties, all such payments to and from Messrs. Anderson and Perez, and all such payments received from third parties;

E.     The imposition of a constructive trust on the '502 patent and all licensing fees and other revenues generated therefrom until such time as Foley & Lardner's claims for compensatory damages, exemplary damages, and costs and attorneys' fees are fully adjudicated and paid in full;

F.     The Plutus Parties be ordered to pay pre-and post judgment interest, attorneys' fees at the highest rate and to the maximum extent provided by law, costs and disbursements incurred by Defendant in connection with this action;

G.     The Plutus Parties be ordered, jointly and severally, to pay exemplary damages to the maximum extent provided by law;

H.     For such other and further relief, both special and general, as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Foley & Lardner demands trial by jury with respect to the issues raised by Plaintiffs' Complaint, Plaintiffs' First Amended Complaint, and Foley & Lardner LLP's First Amended Counterclaims, Third-Party Complaint, and Cross-Claims.

49

Dated:  October 1, 2009

Respectfully submitted,

*s/Melissa R. Smith*

Melissa R.  Smith
Melissa@gillamsmithlaw.com
Lead Attorney
Texas State Bar No. 24001351
GILLAM & SMITH
303 S. Washington Avenue
Marshall, Texas 75670
(903) 934-8450
(903) 934-9257 fax

Michael J. Lockerby
(admitted *pro hac vice*)
mlockerby@foley.com

Gregory E. Neppl
(admitted *pro hac vice*)
gneppl@foley.com

FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC  20007-5143
(202) 672-5300
(202) 672-5399 fax

Attorneys for Defendant
FOLEY & LARDNER LLP

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such this document was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P.  5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on the 1st day of October 2009.

*/s/ Melissa R. Smith*
Melissa R.  Smith