IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DATATERN, INC.
  a Texas Corporation


AMPHION INNOVATIONS US INC.
  a Delaware Corporation, and


FIRESTAR SOFTWARE, INC.
  a Delaware Corporation

          Plaintiffs and
          Counterclaim Defendants

    v.

FOLEY & LARDNER, LLP
  A Wisconsin limited liability partnership

    v.

ERICH L. SPANGENBERG,


IP NAVIGATION GROUP, LLC,
a Texas limited liability company,


AUDREY L. SPANGENBERG,


TECHDEV HOLDINGS LLC
  f/k/a PLUTUS IP LLC1,
  a Texas limited liability company, and

Civil Action No. 2:09-CV-38

JURY TRIAL DEMANDED

ACCLAIM FINANCIAL GROUP, LLC, a Texas
limited liability company,

Third-Party Defendants and Cross-Claim
Defendants.

### IP NAVIGATION GROUP, LLC'S ANSWER AND COUNTERCLAIMS
### TO THIRD-PARTY COMPLAINT AND CROSS-CLAIMS OF
### <u>THIRD-PARTY PLAINTIFF FOLEY & LARDNER LLP</u>

"The adage that 'a lawyer who represents himself has a fool for a client' is the
product of years of experience by seasoned litigators."
*Kay v. Ehrler,* 499 U.S. 432, 437-38 (1991).

Abraham Lincoln is said to have once stated: "He who represents himself has a fool for a client."  Nowhere is this more evident than in the third-party complaint filed by the law firm of Foley & Lardner LLP ("Foley").[1]  Not only does the third-party complaint lack basic factual allegations to support Foley's flawed legal theories, Foley has the temerity to attack the entity— IP Navigation Group, LLC ("IPNav")–that saved the day after Foley completely mismanaged a patent case for DataTern, Inc.[2]  Although Foley's failure to have any facts or legal theory that support the third-party complaint is improper, it becomes outrageous when Foley attempts to position the firm as a "first tier" firm of the "highest character" and, in this effort, launches an attack on IPNav.  Foley is a firm of highly questionable character—one that appears to be undergoing significant financial turmoil—and one that should examine the composition of its own house before casting any stones.

---

[1] Highly-respected and professional local counsel in this matter, Melissa Smith of Gillam & Smith, L.L.P., is not the issue in this case.

[2] The third-party complaint names new defendants without any factual allegations to connect them to the causes of action Foley brings.  Other than the flawed legal theory for which Foley has no good faith basis to assert—except for Foley's attempt to inflict hardship on IPNav—this will not be addressed in the responsive pleading.  Foley's bad judgment is not mitigated in the least by relying on "alter ego" statements made in a district court decision from the Western District of Wisconsin, when that decision has nothing to do with IPNav at all, and therefore has no connection to the acts Foley alleges as the flimsy basis for tort claims.

Compounding its horrible decision-making and lack of judgment, Foley recently rejected IPNav's simple, non-litigious resolution: IPNav delivered a letter to the CEO—Mr. Ralf-Reinhard Böer—and Managing Partner—Mr. Stanley S. Jaspan—of Foley that detailed the facts and errors in the third-party complaint, urged Foley to dismiss this third-party complaint, and proposed that Foley issue a simple apology to IPNav and this Court for its unfounded attacks on IPNav and waste of judicial resources.[3]  Foley did not accept the offer.

IPNav has been extremely successful as an intellectual property strategic consultant—IPNav is not a law firm and does not provide legal services.  IPNav is exclusively engaged in the business of providing third parties with IP strategic advisory services.  Of its own accord, DataTern sought out IPNav and hired IPNav as a consultant.  IPNav worked diligently to reduce the damages caused by Foley's fraud and malpractice—as Foley's own former clients (the "Datatern Parties") alleged in filing their lawsuit in the first place.  Foley's annoyance that its clients would seek out, on their own initiative, strategic financial advice from an IP consulting firm rather than rely on Foley (the real gist of Foley's tort and quasi-contract claims) is palpable.

Foley's bad judgment here is typical, however—typical of Foley's bad decision-making that has it frequently in the news for all types of malfeasance, including sexual discrimination,[4] racial discrimination,[5] trademark abuse involving improper use of its own law firm's name,[6]

---

[3]  A copy of the October 9, 2009 Letter from IPNav to Foley is attached as Exhibit A.

[4]  *The Cold Shoulder*, available at  http://www.sptimes.com/2005/04/03/Business/The_cold_shoulder.shtml  ("In 1988, Bonnie Pinzel closed what she said was the biggest deal of the year for her employer, Foley & Lardner in Tampa….And though Pinzel decided not to pursue her case against Foley in court, she's having some regrets.  The reason, she says:  One of 16 partners in Tampa's Foley office is a woman.  'I wanted the firm to change,' she said. "Sixteen years later, they haven't changed at all.").

[5]  *Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008) (describing amalgam of shocking practices).

[6]  *Foley Hoag Successful in its Trademark Infringement Suit, available at*  http://www.businesswire.com/portal/site/home/permalink/?ndmViewId=news_view&newsId=20061003005611&newsLang=en.

legal malpractice[7]—including revealing client confidences,[8] and fraud.[9]  Foley attempts to draw attention away from yet another case of its bad judgment, involving the Datatern Parties, by launching this frivolous attack on IPNav.  Knowing the dire position in which it finds itself, Foley, acting in large part as its own counsel, filed a pleading that should ultimately lead to the award of damages, fees and expenses to IPNav—**not** to Foley.  It is inconceivable that Foley believes its case against IPNav has any merit whatsoever.  IPNav is not even a competitor law firm.  It merely acts as a strategic consultant to advise on financial matters concerning effective IP monetization strategy, an issue of great concern to owners of intellectual property and one frequently neglected by counsel engaged on a billable-hour fee basis.  Indeed, in just a few short years, IPNav has become an extremely successful and profitable intellectual property strategic consultant.  Unlike Foley, who is apparently facing dire financial straits,[10] notwithstanding gouging and egregious billing practices as its own former clients' filing reflects in this action, IPNav has enjoyed phenomenal financial growth and success as a strategic consultant to IP owners.  IPNav has negotiated hundreds of millions of dollars worth of intellectual property licensing and acquisition transactions since its founding in 2004.

Although Foley's independent failure to meet the needs of its clients is at the root of its third-party complaint, it strikes back at IPNav and others with invective and diatribe.  But in

---

[7] *Foley & Lardner Settles Malpractice Claim*, *available at,* http://www.legaltrends.net/feed/foley-lardner-settles-malpractice-claim ("Foley & Lardner has reached a tentative agreement to settle a legal malpractice lawsuit filed by one of its former clients over an allegedly botched patent application, according to court documents filed in the case.").

[8] *Patent Holding Firm Sues Foley & Lardner for Revealing Trade Secrets*, *available at* http://legaltimes.typepad.com/blt/2009/08/patent-holding-firm-sues-foley-lardner-for-revealing-trade-secrets-.html; *Suit Claims Foley & Lardner Disclosed Confidential Patent Information, at* http://www.abajournal.com/news/suit_claims_foley_lardner_disclosed_confidential_patent_information.

[9] *Available in part at* http://www.encyclopedia.com/doc/1G1-13365359.html; *Acadia Partners, L.P. v. Tompkins*, 759 So. 2d 732 (Fla. 5th DCA 1992).

[10] Foley is reported to be laying off significant numbers of staff and professionals—with its IP group being particularly hard hit.  *Nationwide Layoff Watch: Foley & Lardner Lays Off 39, at* http://www.abovethelaw.com/foley_lardner/ ("Rumor has it that Foley's IP group is especially vulnerable — very little work in that group.").

reality, Foley through its representation of the Datatern Parties, was effectively holding the Datatern Parties hostage—refusing to do any substantive work on the Datatern '502 patent litigation. Foley's ineffectiveness was the reason that the Datatern Parties terminated Foley. Had the Datatern Parties not gone looking for a more effective exit strategy, which resulted in a swift settlement rather than a lengthy billable hour boondoggle for Foley, the Datatern Parties would probably still be incurring the exorbitant legal fees required to afford equity partners' take-home pay, reported in 2005 as $745,000 per equity partner.[11] Foley's financial losses through inefficient management and loss of a client are of their own making. Those losses cannot be dressed up as tort claims to disparage in public filings another, more successful venture.

IPNav now answers the claims of Defendant and Third-Party Plaintiff Foley & Lardner LLP by corresponding paragraph number as follows:

1.    Denied.

2.    Admitted as to accuracy of this language taken from the court decision cited at 559 F. Supp. 2d 947, 958 (W.D. Wis. 2008), pending on appeal, Docket No. 2008-1462 (lead case) in the United States Court of Appeals for the Federal Circuit. Denied as to the entities mentioned being "owned and controlled" by Mr. Spangenberg in his individual capacity as this reflects a misapprehension of Texas law concerning entity formation and the management structure of a Texas limited liability corporation ("LLC"). Denied as to entities mentioned as "owned and controlled" by Mrs. Spangenberg for the same reasons. Foley's own corporate law publication reflects its understanding that a limited liability

---

[11] Even three years ago, in 2005, take home pay per equity partner was reported as $745,000. *See Profits per equity partner up at 'second-hundred' firms*, *available at* http://boston.bizjournals.com/boston/stories/2005/08/22/newscolumn1.html.

company is an "excellent" choice for start-up businesses: Foley recommends the LLC as the choice of entity for "small group, licensing company, etc." *See Foley & Lardner Primer on Selection of Business Entity*, Vol. I of VI in the FOLEY & LARDNER EMERGING COMPANIES PRIMER SERIES, p. 3.[12] Otherwise denied.

3.    IPNav lacks information or knowledge sufficient to form a belief about whether an attorney-client relationship or contract existed as stated with Foley. All allegations of tortious interference are denied. Otherwise denied.

4.    IPNav lacks information or knowledge sufficient to form a belief about the truth of the matters in order to admit or deny any relationship of Firestar or Amphion with Foley. Otherwise denied.

5.    IPNav lacks information or knowledge sufficient to form a belief about the truth of the matters regarding Datatern's becoming a client of Foley or Foley's knowledge regarding the formation of Datatern. Otherwise denied.

6.    IPNav lacks information or knowledge sufficient to form a belief about the truth of the matters stated in order to admit or deny the circumstances of other entities' settlement demand on Red Hat or Red Hat's escrow account. Otherwise denied.

7.    IPNav lacks information or knowledge sufficient to be able to admit or deny FireStar's and Amphion's litigation budget or arrangements made with Foley for representation or the terms of that representation. Otherwise denied.

8.    IPNav lacks information or knowledge sufficient to admit or deny the financial relationship between Firestar-Amphion and Foley or arrangements as to litigation financing. Otherwise denied.

9.    Denied.

---

[12] *Available at* http://www.bizstartsmilwaukee.com/BizFiles/PDFs/primerselectionbusentity_WDFI_Foley.pdf.

10.    Denied.

11.    Denied.

12.    IPNav lacks information or knowledge sufficient to be able to confirm or deny Datatern's intent to file additional patent infringement lawsuits.  Otherwise denied.

13.    Denied.

14.    IPNav lacks information or knowledge sufficient to be able to confirm or deny Foley's corporate status.

15.    IPNav lacks information to admit or deny the nature of Foley's offices or its firm structure.  Otherwise denied.

16.    Denied as to purported good press and accolades concerning alleged reputation of Foley as "leader" in client service.  Public news reports, including the allegations by the Datatern Plaintiffs regarding overbilling, inefficient staffing of the '502 patent litigation matter, and non-disclosure of critical information, suggest otherwise, including:

>    (i)    client claims for patent malpractice, involving a "blown deadline" for an international patent application that "allowed a competitor to profit from the same intellectual property";[13]

>    (ii)    client claims for breach of fiduciary duty[14]; and

>    (iii)    a one-time client that turned on its lawyers and sued individual partners at Foley for assisting with individuals' securing funds ostensibly for a transaction, but allegedly was really for those individuals' personal use.  *See Acadia 'shotgun' hits*

---

[13]    *See* http://www.legaltrends.net/feed/foley-lardner-settles-malpractice-claim ("Foley & Lardner has reached a tentative agreement to settle a legal malpractice lawsuit filed by one of its former clients over an allegedly botched patent application, according to court documents filed in the case."); *Foley Reaches Tentative Deal*, *available at* http://www.abajournal.com/news/foley_lardner_reaches_tentative_deal_to_settle_patent_malpractice_suit.

[14]    *See Benjamin v. Ernst & Young, LLP* (2006), 167 Ohio App.3d 350, 2006 -Ohio- 2739, 855 N.E.2d 128, 130-31(settling breach of fiduciary duty claim).

*lawyers, CPAs (Foley and Lardner partners, Kenneth G. Dixon and Arthur*
*Lipson named as defendants in lawsuit filed by Acadia Partners L.P.*), ORLANDO
BUS. J. 1992.[15]  But Foley and its lawyers' individual liability suggests that client
service means doing anything to win: including frivolous lawsuits against
individuals, such as Forest Service employees who protested a luxury
condominium development[16]—litigation Foley undertook on behalf of a real
estate developer client that resulted in a $267,000 fine against the individual
lawyers, and claims for RICO violations and spoliation in *Kearney v. Foley &*
*Lardner, LLP*, __ F.3d ___, 2009 WL 2973224, at *7 (9th Cir. 2009) (dismissing
spoliation but reversing lower court decision dismissing claims regarding failure
to disclose test results on land, finding wrong standard applied to plaintiff's claim:
"Instead of looking to Kearney's allegations, the district court's ruling seems
based in large part on its belief that Kearney did not do enough to discover the test
results she sought from Defendants [including Foley]").  Otherwise denied.

17.     Denied as to Foley as a "leader" in intellectual property law.  News reports show that
Foley's fortunes have fallen, by more than 100% in its ranking reported from 2008 and
2007 regarding its dwindling frequency of appearances in intellectual property litigation
in district courts.  *See 2008 Patent Litigation Survey: Never a Dull Moment*, IP L. & BUS
(July 2008).[17]  Leadership has many facets, and engendering a racist and sexist[18] work

---

[15] *Available in part at* http://www.encyclopedia.com/doc/1G1-13365359.html; *Acadia Partners, L.P. v. Tompkins*,
759 So.2d 732 (Fla. Ct. App. 1992).
[16] *See Law Firm Fined for Frivolous Law Suit* (August 2005) ("New York University law professor Stephen Gillers,
an expert on legal ethics, said it is 'quite unusual' for a federal judge to issue a 'six-figure sanction against a law
firm.'")
[17]     *Available at Never a Dull Moment:...Who are the District Court Champs*,
http://www.fr.com/news/0807_IP%20Law%20and%20Business_Never%20a%20Dull%20Moment%20Top%20Liti
gation%20Firms.pdf

environment suggests a lack thereof.  The Seventh Circuit has allowed a case to proceed to trial in which it found ample record support for a jury to believe that Foley created pretexts to fire a Muslim attorney of Indian descent, Mr. Hasan, in the wake of 9-11, despite his good performance reviews and the highest billable hours in his section through the late summer of 2001: 2,467.5 hours.  *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 530 (7th Cir. 2008) ("Foley initially claimed that it fired Mr. Hasan for poor performance…However, after Foley located Mr. Hasan's work evaluations, which were mostly positive, the firm changed its tune, maintaining that it actually fired Mr. Hasan not because his work was unacceptable but because it only had enough work to keep the best associates in the department occupied.").  The suspicious circumstances of the change of Foley's story once the controverting documents were uncovered, in addition to an amalgam of pejorative comments, required reversing the summary judgment below and remanding for further proceedings.  *Id*. at 528 ("There is also evidence in the record that Simon's criticisms at that meeting incited anti-Muslim and racially charged commentary from other partners.  Vechiola's description of the meeting as a 'sand-nigger pile on' suggests as much, as does Pfister's comment that Simon had targeted Mr. Hasan just as he had targeted another lawyer, albeit unsuccessfully.  Viewing the facts in the light most favorable to Mr. Hasan, the record would allow the rational inference that Simon not only participated in the decision to fire Mr. Hasan but also may have instigated it.").[19]  Otherwise denied.

18.   Admitted as to Datatern being a Texas corporation.  Otherwise denied.

---

[18]  *The Cold Shoulder, available at* http://www.sptimes.com/2005/04/03/Business/The_cold_shoulder.shtml
[19]  *See also* http://online.wsj.com/public/resources/documents/foleylardner.pdf.

19.    IPNav lacks information or knowledge sufficient to admit or deny allegations regarding Amphion's corporate structure.  Otherwise denied.

20.    IPNav lacks information or knowledge sufficient to admit or deny allegations regarding FireStar's corporate structure.  Otherwise denied.

21.    Admitted.

22.    Admitted that Mr. Spangenberg is the Manager of IPNav.  Otherwise denied.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Admitted insofar as court filings reflect this information.  Otherwise denied.

27.    Admitted that IPNav is a Texas limited liability company.  Otherwise denied.

28.    Admitted that IPNav provides consulting services.  Otherwise denied.

29.    Admitted.

30.    Admitted that Mrs. Spangenberg is the Manager of Acclaim.  Otherwise denied.

31.    Admitted that TechDev Holdings, LLC is based in Marshall, Texas.  Denied as to "owned controlled and directed" by Mr. and Mrs. Spangenberg as a conclusory statement that reflects a misapprehension of Texas law concerning formation of a Texas LLC and the statutory scheme allowing a single-member management structure.  Otherwise denied.

32.    Denied.  The information recited incorrectly refers in part to an early decision based on personal jurisdiction concepts with a lower evidentiary standard, which facts are not fully developed at the early stage of litigation at which a personal jurisdiction challenge is addressed.  The decision does not address substantive liability concepts of Texas alter ego

law, which is what Foley appears to suggest the decision stands for, and is a decision that does not control Texas courts, including United States District Courts sitting in Texas and those courts' application of Texas alter ego law.  Misapprehends Texas alter ego law, which does not mean "subjecting just anyone having any connection with an entity" to a veil piercing allegation.  *Seidler v. Morgan*, 277 S.W.3d 549, 558 (Tex. App.— Texarkana 2009, pet. denied).

33.    Admitted.

34.    Denied.

35.    Denied as to the characterization of this step as "unusual."  What may be more appropriately termed as "unusual" is one district court's order sanctioning Foley lawyers with $267,000 individually for filing a lawsuit against two individuals for merely exercising their right to protest a condominium development.  *See Law Firm Fined for Frivolous Law Suit* (Aug. 2005) ("New York University law professor Stephen Gillers, an expert on legal ethics, said it is 'quite unusual' for a federal judge to issue a 'six-figure sanction against a law firm.  For a court to award that kind of money, the court has to find an utter lack of basis' for the position that the lawyer took in the case, Gillers said.").[20] Otherwise denied.

36.    Denied insofar as Texas law controls what constitutes an "alter ego" and its proper use as merely a remedy for some injustice or wrong—not a substantive cause of action in and of itself; denied as a misstatement of Texas law, that is, that alter ego liability exists merely because an entity is formed to limit liability, which is a bedrock principle of Texas law— as the Texas Supreme Court has stated: "Avoidance of personal liability is not only sanctioned by the law; it is an essential reason that entrepreneurs … choose to incorporate

---

[20] *Available at* http://reclaimdemocracy.org/articles_2005/fine_frivolous_lawsuit.php.

their businesses the purpose for which such entities exist." *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). Denied as to allegation of "perpetrating a fraud" where no such fraud is identified, where no real party in interest is identified as the one allegedly liable for that wrongdoing, and how or why some other person or entity should answer for that wrong. Denied as misstatement of Texas law under the Texas Business Organizations Code, §§ 21.223-21.226. Foley should be well aware of the general principles of veil piercing and the theory's proper purpose. This was the very allegation made against the firm in a 1992 case, in which funds were allegedly transferred from an entity for individuals' personal use—a genuine misuse of the corporate form. *Acadia Partners, L.P. v. Tompkins*, 759 So. 2d 732, 735 (Fla. 5th DCA 2002) ("Acadia alleged that Mr. Lipson and Foley had conspired to devise a plan pursuant to which Mr. and Ms. Tompkins could obtain capital from Acadia for their other real estate businesses as well as their personal use while keeping their true financial condition concealed."). That case was settled once the plaintiff amended to add a claim for punitive damages against Foley. *Id*. Otherwise denied.

37.    Admitted as to accuracy of quoted portions of the cited court decision. Otherwise denied.

38.    Admitted that the decision reported at 519 F. Supp. 2d 905 includes these statements, but in the district court's analysis of a personal jurisdiction question, not for the substantive liability purpose for which Foley appears to cite the opinion, which is not a controlling or authoritative statement on Texas law; denied as eflecting a gross misapprehension of Texas law. Otherwise denied.

39.    Admitted as to this Court's jurisdiction over IPNav.

40.    Admitted as to this Court's jurisdiction over IPNav.

41.    Admitted.

42.    Admitted as to this Court's jurisdiction over IPNav.  Otherwise denied.

43.    Admitted.

44.    IPNav lacks sufficient information or knowledge to be able to admit or deny.

45.    IPNav lacks sufficient information or knowledge to be able to admit or deny.

46.    IPNav lacks sufficient information or knowledge to be able to admit or deny.

47.    IPNav lacks sufficient information or knowledge to be able to admit or deny.

48.    Denied.

49.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether FireStar was developing a commodities trading software product ("Trading Platform") or whether FireStar concluded that a product called "Hibernate" available from JBoss infringed U.S. Patent 6,101,502 (the '502 patent); or whether the '502 patent was then held by FireStar.  Otherwise denied.

50.    IPNav lacks sufficient knowledge or information to knowledge to be able to admit or deny whether the '502 application was a non-provisional one based on two provisional applications with several inventors named.  Otherwise denied.

51.    IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny whether the '502 non-provisional application was indeed such and whether it had one inventor common to the provisional applications.  Otherwise denied.

52.    IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny regarding FireStar and Amphion approaching Foley about enforcing the '502 patent. Otherwise denied.

53.     IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny what Foley told FireStar and Amphion regarding a potential defense of improper inventorship to an infringement lawsuit.  Otherwise denied.

54.     IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny what Foley did to investigate the alleged improper inventorship issue.  Otherwise denied.

55.     IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny whether the alleged infringing Hibernate product is an "open source" product, which JBoss made available for download by anyone for free.  Otherwise denied.

56.     IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny regarding Foley's agreement to represent FireStar and Amphion in enforcing the '502 patent.  Otherwise denied.

57.     IPNav lacks sufficient knowledge or information to be able to admit or deny whether Foley wrote to the CEO of JBoss, Mark Fluery, concerning the infringement allegations.  Otherwise denied.

58.     IPNav lacks sufficient knowledge or information to be able to admit or deny whether or when it became public knowledge that Red Hat, Inc. ("Red Hat") was a provider of open source software and/or was acquiring JBoss or its assets, including Hibernate.  Otherwise denied.

59.     IPNav lacks sufficient knowledge or information to be able to admit or deny whether FireStar and Amphion authorized Foley to write to the CEO of Red Hat advising him that the Hibernate product infringed the '502 patent.  Otherwise denied.

60.     IPNav lacks sufficient knowledge or information to be able to admit or deny whether any response made to Foley's letter and Red Hat's purchase of JBoss and the Hibernate product.  Otherwise denied.

61.     IPNav lacks sufficient knowledge or information to knowledge to be able to admit or deny to which "published reports and public filings" reference is made in order to ascertain the amount Red Hat paid to acquire JBoss and the amount of escrow for contingencies and future claims.  Otherwise denied.

62.     Admitted that PACER reflects that a complaint was filed against Red Hat and JBoss on June 26, 2006 in the U.S. District Court for the Eastern District of Texas, Marshall Division.  Otherwise IPNav lacks sufficient knowledge or information knowledge to be able to admit or deny requests FireStar and Amphion made of Foley.  Otherwise denied.

63.     IPNav lacks sufficient knowledge or information to be able to admit or deny whether FireStar and Amphion made a technical presentation to Foley concerning infringement of the '502 patent by Hibernate.  Otherwise denied.

64.     IPNav lacks sufficient information or knowledge to be able to admit or deny what communications occurred between Firestar and Foley about other intellectual property or other infringement claims against Red Hat.  Otherwise denied.

65.     IPNav lacks sufficient information or knowledge to be able to admit or deny the alleged FireStar and Amphion negotiations with Red Hat.  Otherwise denied.

66.     IPNav lacks sufficient information or knowledge to admit or deny whether Amphion and FireStar invited Foley to negotiations with Red Hat.  Otherwise denied.

67.     IPNav lacks sufficient information or knowledge to admit or deny what Foley told FireStar and Amphion as to the cost of an infringement lawsuit.  Otherwise denied.

68.     IPNav lacks sufficient information or knowledge to able to admit or deny what conversations occurred between FireStar and Ampion and Foley.  Otherwise denied.

69.     IPNav lacks sufficient information or knowledge to be able to admit or deny what Foley may have discussed about terms of a settlement and necessity of a license to Red Hat's customers in relation to the cost of a settlement.  Otherwise denied.

70.     IPNav lacks sufficient information or knowledge to admit or deny what FireStar and Amphion did regarding public relations issues relating to the '502 patent litigation.  Otherwise denied.

71.     IPNav lacks sufficient information or knowledge to admit or deny what any public relations firm advised FireStar and Amphion regarding the '502 patent litigation.  Otherwise denied.

72.     IPNav lacks sufficient information or knowledge to admit or deny how or why FireStar was told to consider itself a "reluctant plaintiff" and any decision not to sue other potential defendants.  Otherwise denied.

73.     IPNav lacks sufficient information or knowledge to admit or deny what FireStar and Amphion were told by Foley as to damages and licensing models.  Otherwise denied.

74.     IPNav lacks sufficient information or knowledge to admit or deny whether FireStar and Amphion permitted the retention of experts.  Otherwise denied.

75.     IPNav lacks sufficient information or knowledge to admit or deny whether Fire Star and Amphion made a $100 million settlement demand for Hibernate's infringement of the'502 or Red Hat's response.  Otherwise denied.

76.     IPNav lacks sufficient information or knowledge to admit or deny what instructions FireStar and Amphion gave Foley about serving the suit on Red Hat in November 2006. Otherwise denied.

77.     IPNav lacks sufficient information or knowledge to admit or deny whether in January 2007 Sun Microsystems petitioned the U.S. Patent and Trademark Office ("USPTO") for re-examination of the'502 patent.  Otherwise denied.

78.     IPNav lacks sufficient information or knowledge to admit or deny what FireStar and Amphion determined as to Sun's re-examination request and their decision to engage an attorney to prosecute the re-examination in the USPTO and/or Foley's continued representation in litigation against Red Hat.  Otherwise denied.

79.     IPNav sufficient information or knowledge to admit or deny when and whether Foley gave FireStar and Amphion a written litigation estimate of approximately $4.4 million to prosecute the '502 patent litigation through trial and whether FireStar and Amphion showed willingness to spend between $5 million and $10 million on the litigation. Otherwise denied.

80.     IPNav lacks sufficient information or knowledge to admit or deny Foley's monitoring third party discovery by Red Hat and what issues that third party discovery involved. Otherwise denied.

81.     IPNav lacks sufficient information or knowledge to admit or deny whether or what Foley needed to demonstrate that the product Hibernate infringed and whether it was freely available for download over the Internet.  Otherwise denied.

82.     IPNav lacks sufficient information or knowledge to admit or deny whether court orders required FireStar to serve its infringement contentions and produce documents by early

June 2007; whether meetings took place between Foley and FireStar engineers and software development managers; and what approval was or was not given by Firestar to Foley. Otherwise denied.

83. IPNav lacks sufficient information or knowledge to admit or deny what knowledge FireStar and Amphion had as to what Foley was doing and whether Foley engaged vendors to assist with electronic discovery activities and whether work was done regarding privilege review of documents and electronically stored information. Otherwise denied.

84. IPNav lacks sufficient information or knowledge to admit or deny what work Foley claims to have done regarding creation of databases to produce and analyze documents produced in the '502 patent litigation. Otherwise denied.

85. IPNav lacks sufficient information or knowledge to admit or deny whether Foley incorporated the document databases into proprietary litigation software. Otherwise denied.

86. IPNav lacks sufficient information or knowledge to admit or deny whether Foley obtained discounted rates of $52.80 per hour for contract attorney review of FireStar e-mails. Otherwise denied.

87. IPNav lacks sufficient information or knowledge to admit or deny how or whether Foley sent bills for discovery and litigation services vendors to FireStar and Amphion and whether there was any mark up. Otherwise denied.

88. IPNav lacks sufficient information or knowledge to admit or deny whether Foley required cooperation from FireStar's engineers and management regarding discovery requests to

Red Hat and to respond to Red Hats discovery requests, to locate documents, and to assist in developing claim construction positions.  Otherwise denied.

89.    IPNav lacks sufficient information or knowledge to admit or deny what kind of agreement if any FireStar and Amphion reached by which Amphion would pay FireStar for the time FireStar's engineers spent assisting with the litigation.  Otherwise denied.

90.    IPNav lacks sufficient information or knowledge to admit or deny what attention or work Foley's claim-construction activities required with FireStar's engineers and managers. Otherwise denied.

91.    IPNav lacks sufficient information or knowledge to admit or deny: how or whether Foley regularly sent invoices to Amphion; whether it was instructed to do so; and whether invoices went unpaid for vendors and outside counsel.  Otherwise denied.

92.    IPNav lacks sufficient information or knowledge to admit or deny: what meetings Foley had with Amphion in December 2007 to review status of the case and expenditures; whether Amphion gave any indication it could not afford to continue the litigation or that it was dissatisfied with the representation; and whether Amphion "instructed Foley & Lardner to press on."  Otherwise denied.

93.    IPNav lacks sufficient information or knowledge to admit or deny what instructions Foley received from Amphion in December 2007 and consistency with alleged earlier instructions to advise Red Hat that FireStar and Amphion were prepared to spend $5 or $10 million.  Otherwise denied.

94.    IPNav lacks sufficient information or knowledge to admit or deny whether after the alleged meeting Amphion paid invoices from Foley or the invoices Foley sent from vendors and local counsel to Amphion to pay directly. Otherwise denied.

95.     IPNav lacks sufficient information or knowledge to admit or deny what Amphion expressed to Foley regarding FireStar's engineers' focus on product development rather than the Red Hat case and lack of responsiveness.  Otherwise denied.

96.     IPNav lacks sufficient information or knowledge to be able to admit or deny:  whether Amphion purchased intellectual property rights to FireStar's Object Spark software and FireStar's patent portfolio, including the '502 patent; whether Amphion assigned the patents to what it represented to be a new entity owned by Amphion, called Datatern; and whether Foley had reason to doubt ownership or existence of Datatern when it filed assignment with the USPTO.  Otherwise denied.

97.     IPNav lacks sufficient information or knowledge to be able to admit or deny: what information Amphion told Foley regarding Datatern's continuing the '502 patent litigation and FireStar's focus on product development efforts and Datatern's focus on product development efforts related to the ObjectSpark software; and whether Amphion knew this information to be false at the time.  Otherwise denied.

98.     IPNav lacks sufficient information or knowledge to be able to admit or deny what or whether Amphion and FireStar advised Foley regarding an alleged strategy of "reluctant plaintiffs."  Otherwise denied.

99.     IPNav lacks sufficient information or knowledge to be able to admit or deny what Foley did for the claim construction phase of the Lawsuit.  Otherwise denied.

100.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether by January 2008 Amphion, FireStar, or Datatern had paid $1,427,338.80 to Foley or whether and under what circumstances Amphion paid $462,497.81, and $373,660.28 of which was applied to FireStar's outstanding balance of $1,338,501.27.  Otherwise denied.

101.    IPNav lacks sufficient information or knowledge to be able to admit or deny what actions Foley took in February 2008 regarding experts and authorization to hire a technical expert.  Otherwise denied.

102.    IPNav lacks sufficient information or knowledge to be able to admit or deny what Foley discussed with Datatern and Amphion regarding the retention of a damages consultant and whether Datatern  and Amphion authorized Foley to engage the damages consultant. Otherwise denied.

103.    IPNav lacks sufficient information or knowledge to be able to admit or deny what Amphion told Foley regarding efforts to raise capital for Datatern, a lack of investors, and reluctance to expend its funds "to prosecute the Lawsuit" while it looked for investors. Otherwise denied.

104.    Admitted that PACER reflects that attorneys Patrick Anderson, of Patrick R. Anderson, PLLC, and Daniel Perez, of The Perez Law Firm, entered appearances on behalf of the Datatern Parties in the '502 patent litigation.  IPNav lacks sufficient information or knowledge to be able to admit or deny what communications occurred in late February 2008 between the Datatern Parties and Foley regarding an agreement with a third party to fund the Lawsuit and new attorneys entering an appearance in the litigation on their behalf.  Otherwise denied.

105.    IPNav lacks sufficient information or knowledge to be able to admit or deny what the Datatern Parties advised Foley regarding Patrick Anderson's and Daniel Perez's involvement in the lawsuit.  Otherwise denied.

106.    IPNav lacks sufficient information or knowledge to be able to admit or deny what action Foley took in response to that information and whether it requested permission to

withdraw its appearance and representation after a reasonable transition period. Otherwise denied.

107.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties refused that request and why and whether Foley's invoices remained unpaid.  Otherwise denied.

108.    IPNav lacks sufficient information or knowledge to be able to admit or deny what, if anything, Foley offered in the way of database access to the new attorneys, Patrick Anderson and Daniel Perez, or whether Foley was told that the new attorneys did not have any litigation support software.  Neither IPNav nor any of its employees ever had access to any Foley database or software.  Otherwise denied.

109.    IPNav lacks sufficient information or knowledge to be able to admit or deny what the Datatern Parties told Foley about granting the new attorneys remote access to what is referred to as Foley's "work product" and litigation software systems and what efforts Foley expended to develop proprietary litigation software and why or to what use the databases were put for paper and electronic documents.  Otherwise denied.

110.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley's invoices remained unpaid and whether the new attorneys representing the Datatern Parties used Foley's litigation software to access documents and pleadings or whether and to what extent the new attorneys relied on Foley's databases and what is referred to as "work product."  Neither IPNav nor any of its employees had any access to Foley's databases or "work product."  Otherwise denied.

111.    IPNav lacks sufficient information or knowledge to be able to admit or deny the nature of Foley's concerns regarding the new attorneys and litigation objectives allegedly previously stated by FireStar and Amphion.  Otherwise denied.

112.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley was also concerned that the new attorneys had determined to take a key deposition of the creator of the Hibernate product prematurely.  Otherwise denied.

113.    IPNav lacks sufficient information or knowledge to be able to admit or deny: whether Foley made additional requests for permission to withdraw along with proposals to transition the work; whether the Datatern Parties denied Foley's requests; and whether the Datatern Parties continued to make no payment of Foley's invoices.   Otherwise denied.

114.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties subsequently requested that Foley review the draft claim construction briefs prepared by the new attorneys.  Otherwise denied.

115.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether there was a failure by the Datatern Parties to pay Foley's outstanding invoices and what work Foley did editing briefs and any communication to Foley from the Datatern Parties. Otherwise denied.

116.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley transferred its database files on hard media to the new attorneys.   Otherwise denied.

117.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley received permission to withdraw or how Foley learned that the '502 patent

litigation had been settled or whether Foley was consulted concerning settlement negotiations.  Otherwise denied.

118.    Denied.

119.    IPNav lacks sufficient information or knowledge to be able to admit or deny: what amount the Plaintiffs had previously agreed to as a litigation budget and what "willingness" was expressed to expend more; and whether Foley could have obtained a settlement of this amount without expenditure of a certain amount of legal fees.  Denied as to "control of the Plutus Parties."  Otherwise denied.

120.    Denied.

121.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley contacted the Datatern Parties to request payment for the legal services Foley allegedly rendered.  Otherwise denied.

122.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley offered the Datatern Parties a discount in return for their agreeing to an installment payment plan.  Otherwise denied.

123.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties refused Foley's installment payment plan or what the Datatern Parties offered in return.  Otherwise denied.

124.    IPNav lacks sufficient information or knowledge to be able to admit or deny: what the Datatern Parties paid of Foley's invoices in January 2008; what benefit was obtained from Foley's alleged legal services; whether the Datatern Parties demanded that Foley remain in the case and continue to provide advice and counsel after the new lawyers

made appearances.  Denied as to work product being misappropriated for the benefit of the Datatern Parties and the Plutus Parties.  Otherwise denied.

### FIRST COUNTERCLAIM AGAINST THE DATATERN PARTIES
### (Breach of Contract)

125.    IPNav incorporates by reference the foregoing Paragraphs 1-124 insofar as Foley does so in Paragraph 125.  Although the breach of contract claim is not directed at IPNav, IPNav answers as follows because of the incorporation by reference of all prior paragraphs in support of the First Counterclaim for Breach of Contract against the Datatern Parties, which prior paragraphs implicate and are aimed at the crossclaims against the "Plutus Parties," defined to include IPNav.

126.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether a valid and enforceable contract existed between Foley and the Datatern Parties.  Otherwise denied.

127.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether there was a contract and, if so, how Foley performed its obligations under that contract.  Otherwise denied.

128.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties failed to pay and whether the Datatern Parties have jointly and severally breached their duties under the contract.  Otherwise denied.

129.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties' breach caused Foley injury and whether the Datatern Parties owe Foley $1,571,038.63.  Otherwise denied.

130.    Denied.

## SECOND COUNTERCLAIM AGAINST THE DATATERN PARTIES
### (Unjust Enrichment)

131.  IPNav incorporates by reference the foregoing Paragraphs 1-130 insofar as Foley does so in Paragraph 131.  Although the Second Counterclaim against the Datatern Parties is not directed at the IPNav, IPNav answers as follows because of the incorporation by reference of all prior paragraphs, which prior paragraphs implicate and are aimed at the crossclaims against the "Plutus Parties," defined to include IPNav.

132.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley and vendors provided goods and services to the Datatern Parties for which Foley and the vendors reasonably expected to be paid.  Otherwise denied.

133.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties received regular invoices from Foley and vendors and whether the Datatern Parties received benefits of the goods and services from Foley and the vendors over an extended time in a manner such that the Datatern Parties knew and the vendors expected to be paid.  Otherwise denied.

134.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether in the receipt of goods and legal services from Foley and vendors, the Datatern Parties, jointly and severally, received a benefit.  Otherwise denied.

135.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties, jointly and severally, knowingly received the benefits of Foley's goods and legal services and goods and services of vendors.  Otherwise denied.

136.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties obtained this benefit through fraudulent acts and the taking of an undue advantage.  Otherwise denied.

137.   IPNav lacks sufficient information or knowledge to be able to admit or deny whether the benefits received from Foley and the vendors by the Datatern Parties would be unjust without payment.  Otherwise denied.

138.   IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties' alleged unjust enrichment has damaged Foley.  Otherwise denied.

139.   Denied.

### THIRD COUNTERCLAIM AGAINST THE DATATERN PARTIES
### (Quantum Meruit)

140.   IPNav incorporates by reference the foregoing Paragraphs 1-139 insofar as Foley does so in Paragraph 140.  Although the Third Counterclaim against the Datatern Parties is not directed at IPNav, IPNav answers as follows because of the incorporation by reference of all prior paragraphs, which prior paragraphs implicate and are aimed at the crossclaims against the "Plutus Parties," defined to include IPNav.

141.   Denied.

142.   IPNav lacks sufficient information or knowledge to be able to admit or deny whether the described services and materials and goods from Foley and the vendors were delivered to the Datatern Parties and whether they are the goods and services from which Foley seeks recovery.  Otherwise denied.

143.   IPNav lacks sufficient information or knowledge to be able to admit or deny whether the services and materials and goods delivered by Foley were accepted by the Datatern Parties or for how long and whether they were used by the Datatern Parties.  Otherwise denied.

144.   IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley regularly forwarded its invoices and the vendors' invoices to the Datatern Parties;

whether the Datatern Parties every protested; or whether the Datatern Parties were reasonably notified that Foley and the vendors expected payment. Otherwise denied.

145. Denied.

## FOURTH COUNTERCLAIM AGAINST THE DATATERN PARTIES
### (Fraud)

146. IPNav incorporates by reference the foregoing Paragraphs 1-145 insofar as Foley does so in Paragraph 146. Although the Fourth Counterclaim against the Datatern Parties is not directed at IPNav, IPNav answers as follows because of the incorporation by reference of all prior paragraphs, which prior paragraphs implicate and are aimed at the crossclaims against the "Plutus Parties," defined to include IPNav.

147. IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties made material false statements and misrepresentations to Foley concerning funding of litigation against Red Hat and payment for legal services and related goods. Otherwise denied.

148. IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties made these false statements and representations knowing they were false. Otherwise denied.

149. IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties made these false statements and representations with the intent that Foley rely upon them. Otherwise denied.

150. IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley relied on the false statements and representations the allegedly Datatern Parties made to Foley. Otherwise denied.

151.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether as a result of the allegedly false statements the Datatern Parties made to Foley, and its alleged reliance on those false statements and representations, Foley has suffered damages. Otherwise denied.

152.    Denied.

## ATTORNEYS' FEES AND EXEMPLARY DAMAGES

153.    IPNav incorporates by reference the foregoing Paragraphs 1-152 insofar as Foley does so in Paragraph 153.  Although the Attorneys Fees' and Exemplary Damages demand in paragraphs 153-159 is not directed at IPNav, IPNav answers as follows because of Foley's incorporation by reference of all prior paragraphs, which prior paragraphs implicate and are aimed at the cross-claims against the "Plutus Parties," defined to include IPNav.

154.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties breached the Fee For Legal Services Agreement, allowing Foley to seek and recover attorneys' fees from the Datatern Parties, jointly and severally.  Otherwise denied.

155.    IPNav lacks sufficient information or knowledge to be able to admit or deny the Datatern Parties have been unjustly enriched, allowing Foley to seek and recover attorneys' fees from the Datatern Parties, jointly and severally.  Otherwise denied.

156.    IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley is entitled to judgment on the basis of quantum meruit, allowing Foley to seek and recover attorneys' fees from the Datatern Parties, jointly and severally.  Otherwise denied.

157.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether the alleged actions and omissions of the Datatern Parties have necessitated the employment by Foley of outside counsel and Foley attorneys and whether Foley is entitled to recover from the Datatern Parties, jointly and severally, reasonable attorneys' fees, costs, and expenses incurred in this Court and on appeal.  Otherwise denied.

158.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties committed acts of fraud for which Foley is entitled to recover exemplary damages.  Otherwise denied.

159.  Denied.

### ANSWER TO FOLEY & LARDNER'S FIRST THIRD-PARTY CLAIM AND CROSS-CLAIM AGAINST THE PLUTUS PARTIES
### (Tortious Interference with Contract and Business Relationship)

160.  IPNav incorporates by reference the foregoing Paragraphs 1-159 as if fully set forth herein.

161.  IPNav lacks sufficient information or knowledge to be able to admit or deny whether a valid and enforceable contract existed between Foley and the Datatern Parties.  Otherwise denied.

162.  Denied.

163.  Denied.

164.  Denied.

165.  Denied.

### ANSWER TO FOLEY & LARDNER'S SECOND THIRD-PARTY CLAIM AND CROSS-CLAIM AGAINST THE PLUTUS PARTIES
### (Unjust Enrichment)

166. IPNav incorporates by reference the foregoing Paragraphs 1-165 as if fully set forth herein.

167. Denied as to any goods and services "misappropriated" by IPNav for IPNav's own benefit. IPNav lacks sufficient information or knowledge to be able to admit or deny whether Foley and the vendors provided goods and services to the Datatern Parties for which Foley and the vendors reasonably expected to be paid. Otherwise denied.

168. Denied.

169. IPNav lacks sufficient information or knowledge to be able to admit or deny whether the Datatern Parties, jointly and severally, knowingly received the benefits of Foley's goods and legal services and the goods and services of vendors. Otherwise denied.

170. Denied.

171. Denied.

172. Denied.

173. Denied.

174. Denied.

### ANSWER TO FOLEY & LARNDER'S THIRD THIRD-PARTY CLAIM AND CROSS-CLAIM AGAINST THE PLUTUS PARTIES
### (Quantum Meruit)

175. IPNav incorporates by reference the foregoing Paragraphs 1-174 as if fully set forth herein.

176. Denied.

177. Denied.

178. Denied.

179. Denied.

180. Denied

181. Denied.

## ANSWER TO ATTORNEYS' FEES AND EXEMPLARY DAMAGES

182. IPNav incorporates by reference the foregoing Paragraphs 1-181 as if fully set forth herein.

183. Denied.

184. Denied.

185. Denied.

186. Denied.

187. Denied.

## FIRST THIRD-PARTY DEFENDANT COUNTERCLAIM
## AGAINST FOLEY & LARDNER LLP
### (Intentional Interference with Contract and with Business Relations)

188. IPNav incorporates by reference the foregoing Paragraphs 1-187 as if fully set forth herein.

189. Because of Foley's inability to accept the notion that a client would seek out other consultants in an intellectual property monetization, licensing or strategic matter, Foley has engaged in conduct that amounts to inference in the consulting business of IPNav and the contractual relationship with the Datatern Parties.

190. IPNav has numerous client development opportunities that have been unjustly diminished in light of Foley's actions.

191.   IPNav had a reasonable possibility of entering into and furthering those business relationships.

192.   Foley committed an independently tortious or unlawful act that (i) interfered with existing contractual relationship with the Datatern Parties and (ii) prevented other business relationships from occurring, including but not limited to, Foley's inappropriate insinuation and threat to its own clients concerning the withholding of further representation, and that they must settle or else Foley would invoke the legal system to file a third-party action, such as the very one they have filed now against various entities, including an amalgam of entities referred to in this litigation as the "Plutus Parties." Such coercive acts are beyond the proper demeanor and professionalism to be expected of counsel, regardless of Foley's frustration at lack of payment from its clients.

193.   Foley, because of its inability to accept that its client sought different and more efficient business advice to effect a swift termination of the '502 patent litigation, either acted with a conscious desire to prevent these and other relationships from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct.

194.   IPNav has suffered actual harm and damage as a result of Foley's interference with the contract and business relationship with the Datatern Parties and others, including but not limited to loss of revenue and consulting fees as well as damages relating to diminished business reputation, as evidenced by media accounts regarding Foley's attempt to divert attention from its own professional negligence to another entity. *See, e.g.*, *Foley Fires Back in DataTern Patent Malpractice Suit*, available at http//www.law360.com/articles/12608.

## SECOND THIRD-PARTY DEFENDANT
## COUNTERCLAIM AGAINST FOLEY & LARDNER LLP
### (Abuse of Process)

195.   IPNav incorporates by reference the foregoing Paragraphs 1-194 as if fully set forth herein.

196.   By filing the third-party complaint, Foley has initiated a process related to litigation that supports an abuse of process cause of action.

197.   On information and belief, Foley will use or will have used the filing of the third-party complaint for an improper purpose, including but not limited to, influencing or coercing other, collateral events involving the Datatern Plaintiffs and interfering with IPNav's business.

198.   On information and belief, Foley has used the judicial process, the filing of the third-party complaint, to serve only an ulterior motive not related in any way to a genuine good faith belief in the merits of the claims against the newly-named third-party defendants, including IPNav.  Using the litigation process in play now to coerce, manipulate, and otherwise extract improper or concessions from its former clients is an actionable ulterior motive for an abuse of process claim.

199.   As an immediate and direct consequence of Foley's improper purpose and ulterior motive, IPNav has suffered injury and damages by Foley's interference with IPNav, resulting in damages in the form of, among other things, attorneys' fees, and justifying an award of exemplary damages.

**FIRST THIRD-PARTY DEFENDANT**
**AFFIRMATIVE DEFENSE TO RECOVERY**
**UNDER UNJUST ENRICHMENT**
**(Unclean Hands)**

200.  IPNav incorporates by reference the foregoing Paragraphs 1-199 as if fully set forth herein.

201.  A party seeking equity must be deserving of an equitable remedy such as a recovery framed in terms of unjust enrichment.  A party seeking an equitable remedy must do equity and come to court with clean hands.  Foley's own unlawful or inequitable conduct precludes it from obtaining equitable relief.

202.  Foley's conduct in connection with the manner in which it handled the representation of the Datatern Parties, such as its threats and coercion to those clients, and how it now seeks to shift blame for its clients' discontent to the clients' consultant, IPNav, and anyone or any entity remotely connected to IPNav, without any facts or law to support those allegations, is conduct that is "unconscientious, unjust, or marked by a want of good faith."  *In re Jim Walter Homes, Inc.*, 207 S.W.3d 888, 899 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding).

203.  Foley fails to show it has been seriously harmed and that the alleged wrong complained of cannot be corrected without applying this equitable doctrine.

**SECOND THIRD-PARTY DEFENDANT**
**AFFIRMATIVE DEFENSE TO RECOVERY**
**UNDER QUANTUM MERUIT**
**(Unclean Hands)**

204.  IPNav incorporates by reference the foregoing Paragraphs 1-203 as if fully set forth herein.

205.    A party seeking equity must be deserving of an equitable remedy such as a recovery in quantum meruit.  In other words, a party seeking an equitable remedy must do equity and come to court with clean hands.  Foley's own unlawful or inequitable conduct precludes it from obtaining this equitable relief.

206.    Foley's conduct in connection with the manner in which it handled the representation of the Datatern Parties, such as its threats and coercion to those clients, and now seeks to shift blame for its clients' discontent to the clients' consultant, IPNav, and anyone or any entity remotely connected to IPNav, without any facts or law to support those allegations, is conduct that is "unconscientious, unjust, or marked by a want of good faith."  *In re Jim Walter Homes, Inc*., 207 S.W.3d 888, 899 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding).

207.    Foley fails to show it has been seriously harmed and that the alleged wrong complained of cannot be corrected without applying this equitable doctrine.

### FIRST AFFIRMATIVE DEFENSE TO RECOVERY UNDER TORTIOUS INTERFERENCE

208.    IPNav incorporates by reference the foregoing Paragraphs 1-207 as if fully set forth herein.

209.    As its first affirmative defense, IPNav states there is no binding or enforceable contract or business relationship on which a tortious interference claim may be premised.

210.    IPNav expressly reserves the right to amend and supplement this pleading, including but not limited to its affirmative defenses and counterclaims.

### ATTORNEYS' FEES AND EXEMPLARY DAMAGES

211.    IPNav incorporates by reference the foregoing Paragraphs 1-210 as if fully set forth herein.

212.   Foley has engaged in conduct that amounts to inference in the consulting business of IPNav and abuse of process, allowing IPNav to seek and recover attorneys' fees from Foley, as stated herein.

213.   The foregoing actions and omissions of Foley have necessitated the employment by IPNav of certain outside counsel and law firms.  IPNav is entitled to recover from Foley, IPNav's reasonable attorneys' fees, costs, and expenses incurred herein and on appeal.

214.   IPNav reserves its right to seek attorneys' fees as damages for Foley's abuse of process.

215.   IPNav requests exemplary damages in connection with its abuse of process to ensure the conduct complained of is not repeated, thereby serving the purpose of exemplary damages.

216.   By bringing these causes of action, IPNav does not waive or release any rights, claims, causes of action, or defenses, or make any election of remedies, which it now has or may have, against Foley, but expressly reserves all such rights, claims, causes of action, and defenses, whether or not the same have been asserted or may hereafter be asserted in this or any other proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Third-Party Defendant/Counter-Plaintiff IP Navigation Group, LLC respectfully prays for the following relief:

A.   That this Court enter judgment denying and dismissing Foley & Lardner LLP's third-party complaint, and that the Court enter judgment in favor of IPNav of a dismissal with prejudice.

B.   On IPNav's First Third-Party Counterclaim, that Foley be ordered to pay damages in an amount to be determined at trial;

C.      On IPNav's Second Third-Party Counterclaim, that Foley be ordered to pay

damages in an amount to be determined at trial;

D.      That Foley be ordered to pay pre-and post judgment interest, attorneys' fees at the

highest rate and to the maximum extent provided by the applicable law, costs and

disbursements incurred by IPNav in connection with this action;

E.      That Foley be ordered, jointly and severally, to pay exemplary damages to the

maximum extent provided by law; and

F.      For such other and further relief, both special and general, as this Court may deem

just and proper.

## DEMAND FOR JURY TRIAL

IPNav hereby demands a trial by jury with respect to the issues raised by Foley's First

Amended Counterclaims, Third-Party Complaint, and Cross-Claims and IPNav's First and

Second Third-Party Defendant Counterclaims.

Dated: October 12, 2009                     Respectfully submitted,

                                            IP NAVIGATION GROUP IP, LLC


                                            By: */s/ Andrew W. Spangler*

                                            **Andrew Wesley Spangler**
                                            Texas State Bar No. 24041960
                                            Spangler Law PC
                                            104 E Houston St, Suite 135
                                            Marshall, Texas 75670
                                            903-935-3443
                                            Fax:  903-938-7843
                                            Email: spangler@spanglerlawpc.com
                                            LEAD COUNSEL



## CERTIFICATE OF SERVICE

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

October 12, 2009                            /s/   Andrew W. Spangler